MILDRED JONES v. ALL AMERICAN LIFE INSURANCE COMPANY

No. 372A84

(Filed 30 January 1985)

1. **Insurance § 35— life insurance proceeds—beneficiary killing or procuring killing of insured—recovery barred under common law principles**

   A beneficiary of a life insurance policy who intentionally and feloniously killed or procured the killing of the insured is barred from recovery of the policy proceeds under common law principles even though the beneficiary is not a "slayer" under G.S. 31A-3(3) because she has not been convicted of killing the insured.

2. **Insurance § 35— life insurance proceeds—issue as to whether plaintiff killed or procured killing of insured—sufficient evidence**

   In an action to recover on a life insurance policy, the evidence was sufficient to create an issue of fact as to whether plaintiff killed or procured the killing of the insured so as to preclude plaintiff from recovering the life insurance proceeds where it tended to show: plaintiff and the insured had previously lived together in plaintiff's house; the insured was last seen alive at about 4:45 p.m. on 17 June when a fellow employee left him at plaintiff's house; insured's body was found on the morning of 18 June some eight miles from plaintiff's house dressed only in shorts with work clothing, shoes with socks in them and a hard hat lying beside him; the cause of death was a .22 or a .25 caliber bullet which had gone through the jaw in an upward and backward direction; the insured's body contained some lineal scrape-like abrasions up and down his back and a tire or grease mark on his lower right leg, which suggested that the body had been dragged out of a car trunk; plaintiff steam cleaned the carpet in her bedroom and washed the bed sheets on the morning the body was found; luminol tests conducted in plaintiff's house revealed the presence of human blood on carpet around the bed in plaintiff's bedroom and continuing out the door and down the hallway; the floor mat of the trunk of plaintiff's car had been removed and was burning in a drum in plaintiff's back yard; the trunk of plaintiff's car was being cleaned by plaintiff's two sons when officers went to plaintiff's house with a search warrant on 19 June; a clot of blood on the rear bumper guard of plaintiff's car matched the insured's blood type; plaintiff worked the evening of 17 June and returned home shortly before midnight; plaintiff had her car with her at work and her .25 caliber pistol was locked in the glove compartment when she returned home; and plaintiff testified that her two sons were the only other persons at her home during the evening of 17 June and neither one of them had the keys to her car.

3. **Insurance § 35— life insurance—beneficiary killing or procuring killing of insured—standard of proof**

   The standard of proof applicable to show that plaintiff killed or procured the killing of insured so as to disqualify plaintiff from recovering life insurance proceeds is proof by the preponderance of the evidence.

**4. Insurance § 35 — life insurance — procurement of killing of insured — identity of principal not required**

   The burden on defendant insurance company seeking to disqualify the plaintiff beneficiary from recovery of life insurance proceeds under the common law theory that the beneficiary procured the killing of the insured is not to identify the principal in the killing but is only to produce evidence from which the jury can find from the greater weight of the evidence that plaintiff procured the death of the insured under circumstances amounting to a felony.

**5. Insurance § 35 — disjunctive issue of whether plaintiff killed or procured killing of insured**

   The submission of a disjunctive issue of whether plaintiff killed *or* procured the killing of the insured in an action on a life insurance policy did not prevent a unanimous verdict and was proper since plaintiff's participation in the killing of the insured by either of the two alternatives bars her from recovering the proceeds of the insurance policy, and the requirement of unanimity is met so long as all twelve jurors find that she participated in one way or the other although six may have found that plaintiff "killed" the insured and six may have found that she "procured the killing."

   Justice VAUGHN did not participate in the consideration or decision of this case.

APPEAL by plaintiff, pursuant to N.C.G.S. § 7A-30(2), from the decision of a divided panel of the Court of Appeals reported at 68 N.C. App. 582, 316 S.E. 2d 122 (1984). The Court of Appeals affirmed the judgment of *Strickland, J.,* entered in favor of defendant during the 15 November 1982 Civil Session of Superior Court, HALIFAX County. Heard in the Supreme Court 11 October 1984.

The plaintiff instituted this action on 19 November 1981 to compel payment of death benefits under an insurance policy on the life of Felbert Hilliard wherein plaintiff was named as beneficiary. Hilliard died of a gunshot wound between 6:00 p.m. on 17 June and 2:00 a.m. on 18 June 1981. Although plaintiff had not been charged in a criminal action in connection with Hilliard's death, the defendant insurance company answered contending that the beneficiary of the policy had murdered or procured the murder of the insured, and was therefore disqualified from recovering the proceeds of his life insurance policy.

The case was tried before a jury, which found in response to an issue submitted to it that Mildred Jones, the plaintiff and beneficiary under the policy, willfully and unlawfully killed or procured the killing of Felbert Hilliard, the insured. Upon this ver-

dict, judgment was entered for defendant, barring any recovery by plaintiff of proceeds under the policy. A majority of the panel of the Court of Appeals affirmed the judgment with one judge dissenting on the grounds (1) that the evidence was insufficient to establish that plaintiff either killed or procured the killing of the decedent Hilliard and (2) that the submission of an issue phrased in the disjunctive deprived plaintiff of her right to a unanimous verdict. Pursuant to Rule 16(b) of the Rules of Appellate Procedure, only these two issues are before this Court for review.

*Frank W. Ballance, Jr. for plaintiff appellant.*

*Allsbrook, Benton & Knott, by J. E. Knott, Jr., and Battle, Winslow, Scott & Wiley, P.A., by J. Brian Scott, for the defendant appellee.*

MEYER, Justice.

[1]    The Court of Appeals held that although the plaintiff did not fit the statutory definition of "slayer" under N.C.G.S. § 31A-3(3), because she had not been convicted of killing Hilliard, the defendant's evidence to the effect that plaintiff killed or procured the killing of the insured nevertheless gave rise to a common law defense to plaintiff's claim for life insurance proceeds. This common law defense was held to survive the enactment of N.C.G.S. § 31A, Article 3 and to apply to appropriate cases outside the purview of the slayer statute. *Quick v. Insurance Co.*, 287 N.C. 47, 54-56, 213 S.E. 2d 563, 568-69 (1975); N.C.G.S. § 31A-15. On the basis of the vast amount of circumstantial evidence produced by the defendant on this defense, the Court of Appeals further held that the issue of whether plaintiff either killed or procured the killing of Hilliard was properly submitted to the jury. We agree.

In *Quick v. Insurance Co.*, 287 N.C. 47, 213 S.E. 2d 563, we held that N.C.G.S. § 31A-15[1] preserved the common law principle,

---

1. That statute provides as follows: "This chapter shall not be considered penal in nature, but shall be construed broadly in order to effect the policy of this State that no person shall be allowed to profit by his own wrong. As to all acts specifically provided for in this chapter, the rules, remedies, and procedures herein specified shall be exclusive, and as to all acts not specifically provided for in this chapter, all rules, remedies, and procedures, if any, which now exist or hereafter may exist either by virtue of statute, or by virtue of the inherent powers of any court of competent jurisdiction, or otherwise, shall be applicable."

theretofore recognized by this Court, that one should not be allowed to profit by his wrong, as to all acts not specifically provided for in N.C.G.S. Chapter 31A. In *Quick* itself, this Court held that a beneficiary in a policy of life insurance whose culpable negligence caused the death of the insured may be disqualified under common law principles from receiving any insurance proceeds from the policy insuring her deceased husband's life. Similarly, in the earlier case of *Anderson v. Parker*, 152 N.C. 1, 2, 67 S.E. 53 (1910), this Court clearly stated:

> It is a principle very generally accepted that a *beneficiary who has caused or procured the death of the insured under circumstances amounting to a felony will be allowed no recovery on the policy.* Vance on Insurance, 392-393; Cooley's Insurance Briefs, 3153; 25 Cyc., 153, 3 A&E (2 Ed.), 1021.

> This wholesome doctrine, referred by most of the cases to the maxim, *Nullus commodum capere potest de injuria sua propria,* has been uniformly upheld, so far as we are aware, except in certain cases where the interest involved was conferred by statute, and the statute itself does not recognize any exception.

*See also Bullock v. Insurance Co.*, 234 N.C. 254, 67 S.E. 2d 71 (1951). *See generally* Annot., 27 A.L.R. 3d 794 (1969). It is the beneficiary's participation in the death of the insured by either of the two alternative means (causing or procuring the death) which bars recovery on the policy. The *fact* of the participation in the death, and not the *method* of participation is the critical issue which must be resolved. Therefore, the Court of Appeals correctly determined that a beneficiary who intentionally and feloniously killed *or* procured the killing of the insured is barred from recovery of the policy proceeds under common law principles recognized in this jurisdiction prior to the enactment of N.C.G.S. Chapter 31A.

[2] We turn first to the question of the sufficiency of the defendant's evidence to take the case to the jury on this issue. The evidence pertinent to this question may be summarized as follows: The plaintiff, Mildred Jones and the decedent, Felbert Hilliard had lived together in her house in Enfield, North Carolina from September 1978 until April 1981. At that time, Hilliard left the plaintiff's house and began living with his father in Bricks,

North Carolina. Plaintiff was the beneficiary of Hilliard's life insurance policy. Shortly before his death, Hilliard stated to a number of his friends and relatives that he intended to change the beneficiary of his life insurance policy. Hilliard's insurance policies were kept in a shoebox under the bed that he and plaintiff slept in while they lived together in plaintiff's house. Under the policy, plaintiff stood to gain approximately $61,000.00.

On the morning of 18 June 1981 the body of Felbert Hilliard was discovered on a Nash County roadside about one-tenth of a mile from the Halifax County line and about eight to ten miles from plaintiff's Halifax County house. Hilliard was dressed only in jockey shorts, which were quite bloody, with some work clothing, shoes with socks in them, and a hard hat lying beside him. Blood was observable in the shoes. The investigating officer observed tire tracks coming from the Halifax County bridge about 500 feet from the body, making a U-turn and going back toward Halifax County. An autopsy was performed that morning. Hilliard had a small bullet wound with powder burns under his jaw, which was determined to be the cause of death. The bullet had gone through the jaw in an upward and backward direction from right to left. His body also contained some lineal scrape-like abrasions up and down his back and a tire or grease mark on his lower right leg, which suggested that the body had been dragged out of a car trunk. The doctor who performed the autopsy testified that Hilliard died within minutes of receiving the wound and that death occurred between 6:00 p.m. on 17 June and 2:00 a.m. on 18 June, the date of the autopsy.

The bullet that had penetrated Hilliard's jaw was determined to be a small caliber bullet, either a .22 or .25. Plaintiff owned a .25 caliber automatic pistol which she kept in the glove compartment of her car.

Hilliard was last seen alive at about 4:45 p.m. on the afternoon of 17 June when a fellow employee left him off at plaintiff's house. Earlier that week, Hilliard had indicated to the plaintiff that he was going out to her house on the 17th to do some gardening and plaintiff told Hilliard that she would take him home if he finished after dark.

At about 9:00 a.m. on the morning of 18 June, plaintiff rented a steam carpet cleaner and rug shampooer from Meyer's Super-

market in Enfield. Later that morning, at about 10:30 a.m., plaintiff was observed in the office of Hilliard's employer near Enfield, inquiring as to how to go about collecting his insurance as she was the named beneficiary. Later that day, the investigating officer, Deputy Sheriff M. M. Reams met plaintiff at Hilliard's parents' home. Upon learning that plaintiff had been Hilliard's girlfriend, Reams asked her a few general questions and learned that plaintiff had spent the day shampooing the carpet at her residence. Plaintiff consented to let the officers look over her residence and accompanied them to her house.

There the officers discovered that the carpet in plaintiff's bedroom was quite damp from a recent steam cleaning and that the bed sheets had just been taken off and washed. The side of the carpet next to the door was wetter than the other side of the carpet. The only room in the house that had been cleaned was the plaintiff's bedroom. When asked, plaintiff told the officers that she owned a .25 caliber pistol and retrieved it from the glove compartment of her car. With the plaintiff's consent, the officers examined the trunk of her car and found that the trunk floormat had been removed. They noticed that the trunk was clean under where the floormat had been, with dirty marks visible around the edges of the clean area.

Plaintiff explained that she had thrown the floormat away about a year before when a battery turned over in the car and spilled acid on it. The officers then walked around the back yard and examined a 55-gallon drum in the back yard with smoke coming from it. A piece of smoldering carpet which had some reddish rust material on it was pulled from the drum. Upon re-examination, the officers found traces of a reddish rust material in the trunk of plaintiff's car.

The next evening, the officers returned with a search warrant for plaintiff's car and house. The plaintiff was not at home, but her two sons and a female were there and they did not want to let the police into the house. The officers testified that the sons were uncooperative, but that they entered anyway and began looking around. A serologist employed by the SBI performed a luminol test in plaintiff's bedroom. The agent observed intense luminescence from the presence of blood on the left side of the bed and alongside the bed leading to the doorway. Evidence of lu-

mination from blood was also found along the hallway and samples of the carpet were taken for later analysis. One of the investigating officers stated that while plaintiff's bedroom was very clean, the rest of the house was filthy. While the SBI agent was running the luminol test, the officers looked around outside and observed the trunk lid of plaintiff's car up and some Clorox bottles, a water hose and a vacuum cleaner beside the car. At this time the inside of the car's trunk had been completely washed out and cleaned with some water standing in the edges. However, the officers did observe a clot of blood on the rear bumper guard, which was removed by the SBI agent and later matched with Hilliard's blood type. The blood sample from the bedroom carpet indicated human blood, but was insufficient in volume to permit further testing.

The plaintiff's testimony established that she was employed as a registered nurse at Nash General Hospital. At the time in question, two of her four children were staying at her house, her 18-year-old son Antonio and her 19-year-old son, Nicholas. Plaintiff stated that she had last seen Hilliard alive early in the morning of 16 June, when she took him to work. According to the plaintiff, she first learned of Hilliard's death when his sister telephoned at about 11:00 a.m. on the morning of the 18th and told plaintiff the news. Upon learning of the death, plaintiff stopped her house cleaning and went to the Hilliard house. At the behest of Hilliard's father, she left there at once to see about getting the insurance proceeds so that burial arrangements could be made, but otherwise remained there until the police arrived.

Plaintiff worked a 2:45 p.m. to 11:15 p.m. shift at the hospital. She testified that on the evening of the 17th she left work at 11:15 p.m. and drove directly home, arriving shortly before midnight. Plaintiff parked her car in front of her house and went inside. According to the plaintiff, her two sons were the only ones at home that evening.

Plaintiff normally kept her handgun in the glove compartment of her car and stated that it was in the car on the evening of the 17th. She testified that upon arriving home, she locked the car, went in the house, went to bed at about 12:30 a.m. and did not get up until about 8 o'clock that morning, which was her day off. Plaintiff plainly stated that her car was locked and the only

Jones v. All American Life Ins. Co.

persons who had keys to her car and its trunk were herself and her son Charles, who lived in Baltimore; neither of the two sons who were staying with her had keys to her car. Moreover, plaintiff stated that she was the only one who drove her car; she would not let her sons drive it "because they abused it so much."

In her response to defendant's pretrial interrogatories and upon direct examination, plaintiff denied that there had been any blood on the floor or carpet beside her bed or in the hallway on the night of the 17th and denied that she had made any effort or attempt to clean blood from her house on the 18th of June. Plaintiff explained that she had rented the carpet cleaning machine on the 18th to clean her bedroom because her son's girlfriend was coming to visit and she planned to put her in there, rather than put her in the unused third bedroom of the house. Although plaintiff denied knowing before Hilliard died that she was named as the beneficiary of Hilliard's life insurance policy, plaintiff stated that she found the policy with other personal papers of Hilliard's in a shoebox under her bed on the morning of the 18th and that the premiums on the policy were paid by draft on a joint account at Peoples Bank & Trust Company in the name of Felbert Hilliard and Mildred Jones. Thereafter, plaintiff directed her attorney to claim the death benefits through Peoples Bank. Neither of plaintiff's two sons testified as witnesses and they were not present in court during the trial.

The Court of Appeals determined that the circumstantial evidence produced at trial sufficed to create an issue of fact for the jury as to whether plaintiff killed or procured the killing of Hilliard; the dissent disagreed with the conclusion that the evidence was sufficient as to either issue, stating that:

> The evidence leads only to surmise and speculation; the greater likelihood that it suggests to me being that he was killed spontaneously in a brawl or fight by one or both of the boys during the six hours that plaintiff was at work and not there, and that her only involvement was in trying to conceal what one or both of the boys had done.

68 N.C. App. at 587, 316 S.E. 2d at 126.

We have little trouble in concluding that the massive amount of circumstantial evidence adduced in this case sufficed to both take the case to the jury on the issue of whether plaintiff either

killed or procured the killing of Felbert Hilliard and to support the verdict entered thereon.

[3]    At the outset it must be remembered that the standard of proof applicable to ordinary civil actions such as this is proof by the preponderance of the evidence. *In re Wilkins*, 294 N.C. 528, 242 S.E. 2d 829 (1978); *Wyatt v. Coach Co.; White v. Coach Co.*, 229 N.C. 340, 49 S.E. 2d 650 (1948). As the Court of Appeals correctly observed, the required degree of proof is not changed by the fact that the conduct with which the party is charged amounts to a crime. *See* 2 Brandis on North Carolina Evidence, § 212 (2d ed. 1982).

Next, we note that the plaintiff did not object, except, or assign error to the submission to the jury of the issue of whether the plaintiff herself killed the insured decedent, Felbert Hilliard. Plaintiff excepted and assigned error to the trial court's submission to the jury of the issue as to whether plaintiff procured the killing of the insured, and only that question is presented by her appeal.

Although both the plaintiff and the dissenting opinion below maintain that the evidence of procurement was inconclusive and speculative, we find ample circumstantial evidence on this issue in the trial transcript.

The plaintiff's uncontroverted evidence established that she had her car with her at work during the afternoon and evening of 17 June. Plaintiff normally kept her .25 caliber automatic pistol in the glove compartment of her car and this handgun was in her car when she returned home from work at about five minutes before midnight. Plaintiff stated that she locked the car that night, went into the house and went to bed within 30 minutes, remaining asleep until about 8 o'clock the following morning.

In all of the evidence presented, the only gun mentioned as being on or about the Jones premises on the night of the killing was the .25 automatic pistol contained in the glove compartment of plaintiff's car at the time she arrived home near midnight. Plaintiff was quite clear in stating that only her two sons Antonio and Nicholas were at home when she arrived that night and that neither of them had keys to her car; she had the only set in the house. Deputy Sheriff Reams testified that the bullet fragments taken from the deceased were of a small caliber, either .22 or .25.

Jones v. All American Life Ins. Co.

Based upon the foregoing evidence and if the jury concluded that plaintiff's .25 caliber pistol was most likely the weapon used upon the deceased, then the jury necessarily concluded that the deceased was killed after plaintiff returned home at about midnight. There was no evidence of record suggesting either that the car had been broken into or that plaintiff's sons had been engaged in a "brawl" with the deceased at any time, as suggested by the dissent below.

[4] The plaintiff strongly contends that notwithstanding these factual circumstances, the defendant must identify the principal in the killing in order to disqualify her from recovering the life insurance proceeds under Hilliard's policy on a theory of procurement. Accordingly, plaintiff argues that because the evidence failed to indicate which of her two sons she "procured" to kill Hilliard, the jury was erroneously allowed "to speculate and surmise that one or more of the sons of plaintiff was somehow procured." We do not agree.

In this civil action, the burden on the defendant insurance company seeking to disqualify the plaintiff beneficiary from recovery of the life insurance proceeds under the common law rule of *Anderson v. Parker*, 152 N.C. 1, 67 S.E. 53, is not to identify the principal, but only to produce evidence from which the jury can find from the greater weight of the evidence that plaintiff caused or procured the death of the insured under circumstances amounting to a felony.

In this context, the terms "cause" and "procure" are nearly synonymous. In Black's Law Dictionary, 5th Ed., "Procure" is defined as follows:

> To initiate a proceeding; to cause a thing to be done; to instigate; to contrive, bring about, effect or cause.

*See also Marcus v. Bernstein*, 117 N.C. 31, 34, 23 S.E. 38, 39 (1895) ("Procure" means "to contrive, to bring about, to effect, to cause"). The evidence in this case suggested that of the three family members present in the Jones residence on the night in question, only the plaintiff herself had a motive to kill Hilliard. The uncontroverted evidence showed that Hilliard's body was discovered on a roadside, some ten miles from the Jones house, clothed only in a pair of bloody jockey shorts, with his work

clothes, hat and shoes piled nearby. No reference to blood on the clothes appears in the transcript. The reasonable inference arising on this evidence is not that the half-naked Hilliard was killed in the course of a fight, but rather that he was shot while in, or preparing for, bed.

The tests conducted in plaintiff's home revealed the presence of human blood on the carpet around the bed in plaintiff's bedroom and continuing out the door and down the hallway, as if something had been dragged along the floor. The fatal bullet penetrated Hilliard's head under the jaw and traveled in an upward and backward direction toward the top of his head. This permits an inference that Hilliard had undressed down to his shorts, folded up his clothes in a pile, removed his shoes, tucked his socks inside his shoes, went to sleep in plaintiff's bed and was more than likely asleep when someone in that house put the gun under his chin and fired—a gun which was not brought home until plaintiff returned from work. Plaintiff testified that she went to bed within 30 minutes after she returned home from work on the night of the 17th.

It is clear from the plaintiff's own unqualified testimony that she locked the car containing the gun and that she was the only one at home with a set of keys. Under these circumstances, the reasonable inferences which may be drawn are that either plaintiff herself shot the deceased when she returned from work and found him in her bed, or that she gave either or both of her sons the keys to her car in order to obtain the pistol and shoot Hilliard.

For the purposes of this civil action, defendant need not produce evidence of a specific agreement between the plaintiff and her sons regarding Hilliard's death, but need only show that plaintiff caused, instigated or brought about the killing. On the evidence presented, the jury could reasonably find that plaintiff was present in her home at the time the decedent was killed. "'When the bystander [to a criminal act] is a friend of the perpetrator and knows that his presence will be regarded by the perpetrator as an encouragement and protection, presence alone may be regarded as an encouragement'." *State v. Rankin*, 284 N.C. 219, 223, 200 S.E. 2d 182, 185 (1973), *quoting* Wharton, Criminal Law, 12th Ed., § 246. Therefore, if the jury found that Hilliard was shot in plaintiff's bedroom; that her .25 caliber

Jones v. All American Life Ins. Co.

automatic pistol was most likely the death weapon; that plaintiff controlled access to the weapon in her car and was present at the scene at the time Hilliard was killed; and if the jury subscribed to the theory that either or both of her sons were the actual perpetrators, plaintiff's presence and her *"relation* to the actual perpetrator(s)," *id.* at 223, 200 S.E. 2d at 185, would support a finding that she aided in, encouraged or "procured" the killing of the deceased. Additionally, there was evidence indicating that Hilliard's body had been transported to the Nash County roadside, where it was later found, in the trunk of plaintiff's car and that plaintiff's sons were engaged in cleaning out the trunk of the car when the police officers returned to her home with the search warrant on 19 June 1981. Moreover, the sons were described as being uncooperative with the police investigators despite their being informed that the officers had a warrant to search the premises.

Thus, ample circumstantial evidence was presented from which the jury could find, and did find, that plaintiff either killed or procured the killing of Felbert Hilliard. Accordingly, the trial judge properly submitted the issue of procurement to the jury and properly denied all of plaintiff's motions with regard thereto.

[5] Plaintiff also alleges error in the trial court's instructions to the jury on the common law "slayer" defense raised by defendant's evidence. Plaintiff contends that the submission of the disjunctive issue of whether plaintiff *killed or procured the killing* of Felbert Hilliard was ambiguous and prevented the jury from reaching an unanimous verdict. In other words, that submission of the disjunctive issue left open the possibility that less than all the jurors could agree on whether plaintiff herself killed Hilliard, or had him killed by her sons or some other party.

We are not persuaded that the instruction in the alternative resulted in a nonunanimous verdict in this case. The pertinent portion of the judge's instruction setting out the issue to be answered by the jury is as follows:

Now, ladies and gentlemen of the jury, as I have already indicated, your verdict will take the form of an answer to a certain question or issue, and this issue reads as follows:

\* \* \*

Did Mildred Jones, the plaintiff, willfully and unlawfully *kill* Felbert Hilliard *or procure his killing?*

The pertinent portions of his instructions relating to the elements to be found in order to answer the issue are as follows:

Now, I charge that for you to find that the plaintiff, Mildred Jones, willfully and unlawfully *killed* Felbert Hilliard *or procured his killing,* the defendant, All American Life Insurance Company, must prove the following things by the greater weight of the evidence:

First, that the plaintiff intentionally, willfully and unlawfully killed Felbert Hilliard by shooting him. [There follows instructions regarding the requisite intent, willfulness and proximate cause.]

\* \* \*

Or that *the killing was* willfully and unlawfully committed by some other person by that person shooting Felbert Hilliard, and the shooting was a proximate cause of Felbert Hilliard's death. And that before the killing was committed, the plaintiff *procured* that other person to commit that killing.

So finally, I charge that if you find that . . . *Mildred Jones,* the plaintiff, intentionally, . . . *killed Felbert Hilliard* by shooting him, . . . *or that* . . . some other person intentionally, . . . by shooting him, and the shooting was the proximate cause of Felbert Hilliard's death; and that, before the killing was committed, *Mildred Jones procured that other person to commit the killing,* it would be your duty to answer the issue "Yes" in favor of the defendant All American Life Insurance Company.

\* \* \*

*I instruct you that a verdict is not a verdict until all twelve jurors agree unanimously as to what your decision shall be. You may not render a verdict by majority vote.*

You all have a duty to consult with one another. . . . But none of you should surrender your honest conviction solely because of the opinion of your fellow jurors or for the mere

purpose of returning a verdict, *and when you have reached a unanimous verdict as to the issue*, have your foreman write the answer on the issue form which will be sent back to you in just a moment after you enter your jury room. (Emphasis added.)

The trial judge specifically instructed the jury that defendant had the burden to prove to the jury that plaintiff either killed Hilliard or, alternatively, that she procured the killing of Hilliard. It is clear from the instruction that all twelve jurors had to find the existence of plaintiff's participation in Hilliard's death by one or the other alternative means by which the plaintiff would be barred from recovery of the insurance proceeds under the common law rule of *Anderson v. Parker*, 152 N.C. 1, 67 S.E. 53 ("caused or procured the death of the insured under circumstances amounting to a felony"). Because plaintiff's participation in the killing of the insured by either of the two alternatives bars her from recovering the proceeds of the insurance policy, it is only necessary that the jury agree unanimously that she so participated. That is, so long as all twelve jurors find that she participated in one way or the other the requirement of unanimity is met although six may have found that plaintiff "killed" Hilliard and six may have found that she "procured the killing."

On the record before us, we find no error in the judgment entered in favor of the defendant insurance company. The decision of the Court of Appeals is

Affirmed.

Justice VAUGHN did not participate in the consideration or decision of this case.