STATE v. ALLEN

[339 N.C. 545 (1995)]

No. 32A94

(Filed 10 February 1995)

**1. Criminal Law § 884 (NCI4th)— failure to object to instruction—question not preserved for appeal**

A question concerning the trial court's instructions on aiding and abetting was not preserved for appeal under Rule 10(b)(2) where the State made a general request for an instruction on aiding and abetting as a theory of guilt of first-degree murder; defense counsel did not object when the court decided to give an instruction and did not make a specific request as to the form of

STATE v. ALLEN

[339 N.C. 545 (1995)]

the instruction; defense counsel again did not object after the court gave its instructions on aiding and abetting; and the trial court was thus never made aware of a specific instruction sought by the parties.

**Am Jur 2d, Trial §§ 1459 et seq.**

2. **Criminal Law § 797 (NCI4th)— aiding and abetting murder—specific intent—erroneous instructions—absence of plain error**

The trial court erred by instructing the jury that defendant would be guilty of aiding and abetting a first-degree murder if, in addition to other elements, the jury found that when defendant handed a gun to the perpetrator he "should have known" or had "reasonable grounds to believe" that the perpetrator intended to kill the victim because the instructions do not convey the concept of specific intent necessary for aiding a first-degree murder committed with premeditation and deliberation. However, this error did not constitute plain error where (1) the instructions as a whole, including the court's use of the phrase "knowingly aided," conveyed to the jury that under the theory of aiding and abetting, defendant had to have the specific intent to kill the victim, had to know this was the perpetrator's intent when he handed him the gun, and intended to aid the perpetrator in the crime; (2) the erroneous portion of the instructions did not have a probable impact on the jury's guilty verdict in light of substantial evidence of defendant's intent to kill the victim; and (3) the jury's verdict of guilty of first-degree murder and its rejection of a verdict of involuntary manslaughter indicated that it did not believe defendant's testimony that he thought the perpetrator only intended to scare the victim and showed that it is improbable that the erroneous portion of the instructions had an impact on the verdict.

**Am Jur 2d, Trial § 1256.**

3. **Criminal Law § 797 (NCI4th)— instructions—aiding and abetting murder—involuntary manslaughter—intent—no shift of burden of proof to defendant**

Neither the trial court's instructions on aiding and abetting as a theory of guilt of first-degree murder nor its instructions on involuntary manslaughter shifted the burden of proof of intent to defendant when the court indicated that if defendant thought the perpetrator was only going to scare the victim, then the State had

failed to prove that defendant knew or had reasonable grounds to believe that the perpetrator was going to kill the victim, or when the court instructed that involuntary manslaughter by aiding and abetting would be the appropriate verdict under defendant's testimony that "when the [alleged perpetrator] requested that he hand him the gun and he handed him the gun, he only thought that [the alleged perpetrator's] intent was to scare . . . [the victim] with the gun." The probable interpretation of this portion of the aiding and abetting instructions was that if the State failed to prove that defendant aided and abetted the alleged perpetrator in the first-degree murder, then the jury was to consider the verdict of involuntary manslaughter, and the involuntary manslaughter instruction merely directed the jury to consider defendant's testimony. Further, the trial court's instructions on aiding and abetting and on involuntary manslaughter expressly placed on the State the burden of proving defendant's guilt of the charges beyond a reasonable doubt.

**Am Jur 2d, Trial § 1256.**

4. **Criminal Law § 904 (NCI4th)— first-degree murder—disjunctive instruction—aider and abetter or principal—no denial of unanimous verdict**

Defendant was not denied his right to a unanimous verdict by the trial court's final mandate directing the jury to find defendant guilty of first-degree murder if the State had proved beyond a reasonable doubt all of the elements of either the theory of defendant as the principal or the theory of defendant aiding and abetting another who acted as the principal since a disjunctive instruction does not lead to a fatally ambiguous verdict if it allows the jury to find a defendant guilty based on either of two underlying acts, both of which separately support a theory of guilt for only one offense; the instruction allowed the jury to consider two theories of guilt for first-degree murder, that is, that defendant alone shot the victim or that defendant aided and abetted another who shot the victim; and a finding of either of these two acts would permit the jury to return a verdict of guilty of the offense of first-degree murder.

**Am Jur 2d, Criminal Law §§ 598, 559; Trial § 1437.**

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Barnette, J., at

IN THE SUPREME COURT

STATE v. ALLEN

[339 N.C. 545 (1995)]

the 2 September 1993 Criminal Session of Superior Court, Lee County, on a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 9 January 1995.

*Michael F. Easley, Attorney General, by Thomas B. Murphy, Associate Attorney General, for the State.*

*Nora Henry Hargrove for defendant-appellant.*

WHICHARD, Justice.

Defendant was indicted for one count of first-degree murder, was tried noncapitally and found guilty, and was sentenced to life imprisonment. We find no prejudicial error.

At defendant's trial the State presented evidence that tended to show the following:

On the evening of 20 February 1992, Detective Dale Barber found the body of Jacob Bernard Smith on the side of a road in Sanford, North Carolina. Detective Barber searched the area and found two .9 millimeter gun shells about ten feet from the body.

Detective Jesse Gentry of the Sanford Police Department went to the scene but could not find anyone who had seen what had happened to the victim. Later, on 20 March 1992, Detective Gentry interviewed Antonia Maurice Allen, the defendant. Detective Gentry advised defendant of his *Miranda* rights, which he waived. Defendant then gave an oral statement, which Detective Gentry reduced to writing and defendant signed. In that statement, defendant indicated that on the night of the murder he was with Thomas Mitchell; Mitchell's girlfriend, Polly Chalmers; and Chalmers' mother, Laura Brown, from 8:00 p.m. to 11:30 p.m. They were playing cards at Chalmers' house. He further stated that he did not have his .38 caliber gun with him and that he did not go anywhere that night. He indicated that he kept his gun at his residence.

Defendant then agreed to go with Detective Gentry to his residence and retrieve the gun. Detective Gentry sent the gun, a five-round magazine that was loaded in the gun, the shells found at the scene, and two bullets that were recovered from the victim's body during the autopsy to the State Bureau of Investigation for analysis. A firearms identification expert testified that the bullets recovered from the victim's body had been fired from defendant's gun.

On 30 March 1992 Detective D.M. Smith, who received the ballistics report, arrested defendant during defendant's shift at McDonald's. At the police department Detective Smith advised defendant of his rights, which he waived. Defendant gave an oral statement, which Detective Smith reduced to writing and defendant signed. In that statement, defendant indicated that on the night of the murder, Mitchell picked him up at approximately 6:00 p.m. Defendant and Mitchell had gone earlier in the day to Goldston to have defendant's gun repaired. After Mitchell picked him up, defendant placed his gun in the glove compartment of Mitchell's car. They went to Chalmers' house. Later, they drove to Fourth and Maple Streets and saw the victim walking. Mitchell pulled over. Mitchell took defendant's gun from the glove compartment, walked up to the victim, and engaged him in conversation. The two men argued. Defendant heard two shots and Mitchell returned to the car. Mitchell then drove defendant home and returned his gun to him. Defendant further stated that he had seen Mitchell six or seven times since the shooting and that Mitchell had said nothing about it.

On the same day, after defendant gave his statement, Detective Smith arrested Thomas Mitchell. Mitchell's statement to Detective Smith was "hearing [sic] no evil, see no evil, say no evil."

On 9 April 1992 Sheriff's Detective James Parker interviewed defendant. After waiving his rights, defendant told Detective Parker he had not been involved in the shooting of the victim. He then told Parker that on the evening in question, he and Mitchell drove to the area of Fourth and Maple. The victim approached the car and spoke. Mitchell asked the victim about obtaining some marijuana, and the victim responded that he could get some for him. The victim then turned and began walking away from the car. Mitchell grabbed defendant's gun and shot the victim. Mitchell then took defendant home.

Detective Parker further questioned defendant, who told him the reason the victim was shot was because Michelle Hollingsworth, the victim's girlfriend, told Mitchell and him that the victim stole her food stamps. Defendant stated that he would shoot him. He and Mitchell then got in Mitchell's car, and Mitchell stated that he would shoot the victim. They saw the victim on the street, and he approached Mitchell's car. As the victim turned to leave, Mitchell asked defendant for the gun. Defendant gave him the gun and Mitchell shot the victim three times. Defendant subsequently gave a similar statement to Cap-

tain Andy Stone of the Sanford Police Department. Detective Parker and Captain Stone testified to defendant's statements made to them from notes they had made in the interviews. Defendant did not sign the notes, and they were not reduced to a written statement.

Michelle Hollingsworth testified that she was at Chalmers' house on 20 February 1992. According to Hollingsworth, defendant also was there that night. She stated that she told Mitchell and defendant her food stamps were missing, the victim had been in the area at the time they disappeared, and she had heard that he had some food stamps he was selling. She then heard defendant say that at one time the victim and some other people had pulled a gun on him. She did not recall either Mitchell or defendant saying anything else about the incident that night.

Polly Chalmers, who has a child by Mitchell, also testified about the food stamp discussion that occurred in her home on 20 February 1992. According to Chalmers, defendant asked Hollingsworth if she wanted him to "take care of it," and he commented that he had a "beef" with the victim. She stated that Mitchell stayed with her the rest of the evening and did not leave until the next morning. She and Mitchell did not go to bed until 2:00 a.m. because they were playing cards.

Thomas Mitchell testified that he and defendant had gone to Goldston about a month and a half prior to the shooting to get defendant's gun repaired. On the day of the crime, he and defendant left McDonald's, where Mitchell worked with defendant, and went to Chalmers' house. The conversation about the food stamps occurred, and Mitchell testified that defendant told Hollingsworth he would take care of it if she wanted him to because he already had a "beef" with the victim.

Mitchell could not state how long defendant stayed at Chalmers'. He testified that he stayed at Chalmers' the entire evening. He stated that he barely knew the victim, that he did not use marijuana, and that he did not ask the victim to get him any marijuana. He had a prior conviction for assault on a female. He denied killing the victim. On cross-examination Mitchell testified that he had been charged with first-degree murder of the victim; that defendant had testified against him in Mitchell's probable cause hearing; and that the day before Mitchell testified at defendant's trial, his own case was dismissed.

Doris Princh, Hollingsworth's cousin, testified that she was at Chalmers' house when the food stamp discussion occurred. She stated that defendant told Hollingsworth he would take care of the victim because the victim had stolen her food stamps. Defendant also indicated he would take care of the victim even if Hollingsworth did not want him to because the victim previously had pointed a gun at defendant's head.

Defendant's evidence tended to show the following:

Defendant testified that on 20 February 1992 he and Mitchell left McDonald's together and went to Goldston to get a firing pin for his gun. They left Goldston at approximately 5:00 p.m. They then went to Chalmers', where he heard Princh and Chalmers have a discussion about the stolen food stamps. Defendant stated that he did not respond to the conversation and did not make any statements about the victim. He further testified that he had not had any trouble with the victim and that he did know him and saw him only occasionally.

Defendant stated that Mitchell gave him a ride from Chalmers' at approximately 10:00 p.m. Defendant was in the passenger seat, and the gun was on the seat between them. Mitchell drove to Fourth and Maple. They saw the victim, who yelled at them. Mitchell stopped his car on the right-hand side of the road. The victim was on the left-hand side. Mitchell and the victim began to speak through the window of the car. Defendant asked Mitchell to take him home. When the victim walked away from the car, Mitchell asked defendant for the gun. The safety was on and defendant thought Mitchell was only going to scare the victim with it. Defendant gave the gun to Mitchell, who began firing the gun at the victim.

Defendant heard the victim yell and saw him grab himself as he fell. Mitchell drove away and took defendant home. Twenty minutes later Mitchell, now with Chalmers in a different car, returned to defendant's house. They picked up defendant and drove to a friend's workplace.

A few days after the murder, defendant heard Mitchell tell Peter Baker, a mutual friend, that Mitchell had shot the victim. A few weeks later, Mitchell made the same statement to Baker again. Defendant again testified that he did not know Mitchell was going to shoot the victim.

On cross-examination defendant testified that his prior statements that Mitchell and the victim were talking about marijuana and

that he had heard Mitchell say he was going to shoot the victim were not true. He denied telling Detective Parker that he said he was going to shoot the victim. He further stated that he did not tell any officer that he and Mitchell talked about how to lure the victim over to the car.

Ruth Bland, manager of the McDonald's where defendant and Mitchell worked, testified that although Mitchell did not work on 20 February 1992, he came to her and asked her for a paper that would indicate that he had worked that day.

Peter Baker testified that he knew defendant and Mitchell. He corroborated defendant's testimony that Mitchell told him that Mitchell, not defendant, shot Smith. He further stated that a few weeks later he again heard Mitchell claim responsibility for shooting the victim. Baker further corroborated defendant's testimony in that Baker saw Mitchell bring defendant home at approximately 10:00 p.m. He then saw Mitchell return with Chalmers about twenty minutes later.

Charlene Wicker, defendant's girlfriend, also testified that Mitchell brought defendant home at approximately 10:30 p.m. and that he returned with Chalmers twenty minutes later and defendant left with them. She heard Mitchell tell Baker that he shot the victim.

Private Investigator Walter Yentch testified that he spoke with Baker and Wicker. They both told Yentch about Mitchell's inculpatory statement and about the times of Mitchell's arrivals and departures from defendant's home on the night of the shooting.

Yentch further testified that defendant made a statement to him. In it defendant stated that during the food stamp discussion, he jokingly asked Hollingsworth if she wanted the victim shot. Mitchell then stated that he and defendant should go shoot him. Defendant thought Mitchell was joking. They left together and drove to Fourth and Maple in the area of Mitchell's mother's home. Mitchell stopped the car when he saw the victim, who then approached the car. Defendant asked the victim about marijuana. Mitchell spoke to the victim but defendant could not hear him. The victim walked away from the car; Mitchell asked defendant to hand him the gun. Defendant thought he was going to scare the victim, so he handed him the gun. Mitchell then leaned out the window and shot the victim.

[1] Defendant first assigns as error the trial court's instructions on aiding and abetting. During the charge conference, the State re-

quested, without specification of precise form, an instruction on aiding and abetting as a theory of guilt of first-degree murder. The court agreed to give such an instruction, and defense counsel did not object. Following the court's charge to the jury, the court inquired whether there were any objections, and defense counsel again did not object.

Defendant contends that under *State v. Keel*, 333 N.C. 52, 423 S.E.2d 458 (1992), this assignment of error is preserved for appeal. He points to the following statement as supportive of his position: "The State's request, approved by the defendant and agreed to by the trial court, satisfied the requirements of Rule 10(b)(2) of the North Carolina Rules of Appellate Procedure and preserved this question for review on appeal." *Id.* at 56-57, 423 S.E.2d at 461. We disagree with defendant's interpretation of *Keel*'s applicability to this case.

Rule 10(b)(2) of the North Carolina Rules of Appellate Procedure mandates the procedure for preserving jury instruction questions for appeal. It states:

> A party may not assign as error any portion of the jury charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly that to which he objects and the grounds of his objection; provided, that opportunity was given to the party to make the objection out of the hearing of the jury, and, on request of any party, out of the presence of the jury.

N.C. R. App. P. 10(b)(2). In *Keel* the State, during the charge conference, specifically requested the North Carolina Pattern Jury Instruction on the intent element of first-degree murder. The trial court agreed to give that portion of the pattern instructions and asked the defense counsel if he had any objection. The defense counsel responded that he did not. The trial court then gave an instruction that differed from the pattern instruction. Based on the State's request and the defense counsel's agreement that a specific pattern instruction be given, we determined that the defendant had satisfied Rule 10(b)(2), and we deemed the question preserved for appeal. *Keel*, 333 N.C. at 56-57, 423 S.E.2d at 461.

In other cases this Court also has considered a question regarding jury instructions preserved for appeal even though the defendant failed to object to the instructions given. In *State v. Montgomery*, 331 N.C. 559, 570, 417 S.E.2d 742, 748 (1992), the defense counsel submit-

ted a written request for the pattern jury instruction on reasonable doubt. The trial court, however, gave a different instruction to which the defense counsel did not object. We considered the question preserved because the defense counsel's specific, written request for a different instruction constituted a sufficient objection to the instruction given to satisfy Rule 10(b)(2). Similarly, in *State v. Ross*, 322 N.C. 261, 265, 367 S.E.2d 889, 891 (1988), the defense counsel requested the pattern jury instruction on the defendant's failure to testify. The trial court agreed to use it but during the charge omitted it entirely. Based on the defense counsel's specific request, we considered the question preserved for appeal. *See also State v. Pakulski*, 319 N.C. 562, 574-75, 356 S.E.2d 319, 327 (1987) (where defense counsel specifically requested pattern instruction on prior inconsistent statements and instruction was omitted, question was preserved because the spirit of Rule 10(b)(2) was satisfied).

In all of these cases the trial court agreed to give specific, requested instructions but then either omitted the instruction entirely or gave one which differed from the requested instruction. As we previously have stated, "[t]he purpose of Rule 10(b)(2) is to encourage the parties to inform the trial court of errors in its instructions so that it can correct the instructions and cure any potential errors before the jury deliberates on the case and thereby eliminate the need for a new trial." *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983). In *Keel, Montgomery*, and *Ross*, the trial court was aware of the specific instruction to be given and that the State and the defendant had no objections to its form. When the trial court in those cases failed to give the instruction or gave a different instruction from that specifically requested, we considered the purpose of Rule 10(b)(2) fulfilled because the trial court had the opportunity to instruct in the manner the parties perceived as unobjectionable.

In contrast, here the State made a general request for an instruction on aiding and abetting as a theory of guilt of first-degree murder. Defense counsel did not object when the court decided to give an instruction and did not make a specific request as to the form of the instruction. Thus, the trial court never was made aware of a specific instruction sought by the parties. After the court gave its instructions on aiding and abetting, defense counsel again did not object. Because defense counsel did not object to the instructions the court decided to give, the court never had the opportunity to cure any perceived errors in the instructions. Under these circumstances, the spirit and

purpose of Rule 10(b)(2) are not met. We therefore consider this question not preserved for appeal.

Because this question is not preserved for appeal, we may review it only for plain error. *Odom*, 307 N.C. at 660, 300 S.E.2d at 378. To constitute plain error, an instructional error must have "had a probable impact on the jury's finding of guilt." *Id.* at 661, 300 S.E.2d at 379-80. Defendant, therefore, "must convince this Court not only that there was error, but that absent the error, the jury probably would have reached a different result." *State v. Jordan*, 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1993).

The trial court first instructed the jury on the theory of defendant's possible guilt as principal and delineated the elements the State would have to prove beyond a reasonable doubt to establish guilt under that theory. It then gave the following instructions on the theory of aiding and abetting:

> Now, a person may be guilty of a crime such as first-degree murder although he personally does not do any of the acts necessary to constitute that crime. A person who aids and abets another to commit a crime is guilty of that crime. You must clearly understand that if he does aid and abet he is guilty of the crime just as if he personally did—personally performed all the acts necessary to constitute the crime. Now under this theory, for you to find the defendant guilty of first-degree murder because of aiding and abetting, the State must prove three things beyond a reasonable doubt.

> First, that the crime of first-degree murder was committed by Thomas Mitchell. In other words, Thomas Mitchell intentionally and with malice killed Jacob Bernard Smith with a deadly weapon. And, second, that Thomas Mitchell's act was a proximate cause of Jacob Bernard Smith's death. And, third, that Thomas Mitchell specifically intended to kill Jacob Bernard Smith. And fourth, that Thomas Mitchell acted with premeditation. And, fifth, that Thomas Mitchell acted with deliberation.

> And the second thing that the State must prove in this connection is that this defendant, Antonia Maurice Allen, *knowingly aided* Thomas Mitchell in committing this crime. In this connection I would instruct you, if you find that when the defendant—well, when Thomas Mitchell or—if you find that Thomas Mitchell requested that this defendant hand him the pistol, and that this

defendant handed him this pistol, and at the time that he handed him this pistol, *he should have known or he knew or he should have known that Thomas Mitchell intended to kill Jacob Bernard Smith,* then you can find that the State has proven this element as to aiding and abetting the crime of first-degree murder. However, if you cannot find this, or if you cannot find that when Thomas Mitchell requested that this defendant hand him the pistol, and that when this defendant handed him this pistol that this defendant—. If you cannot find that this defendant believed he was going to kill Jacob Bernard Smith, that on the contrary, that he believed or had a reasonable belief that he was only going to scare him with the gun, then if the State has failed to prove this, in other words, if they have failed to prove that at the time he was asked for the gun and defendant gave him the gun, that this *defendant knew or had reasonable grounds to believe that he was going to kill Jacob Bernard Smith*—the State has failed to prove this—then they have failed to prove this element of aiding and abetting first-degree murder.

(Emphasis added.)

Now, the third thing that they're required to prove to you on this theory is that the defendant's actions, that's Antonia Maurice Allen's, caused or contributed to the commission of a crime of first-degree murder by Thomas Mitchell.

The Court then instructed on involuntary manslaughter as follows:

Involuntary manslaughter is the unintentional killing of a human being by an unlawful act, not amounting to a felony, or an act done in a criminally negligent way. Involuntary manslaughter would only arise under the version of what happened according to what the defendant himself testified to, that is, his testimony that when Thomas Mitchell requested that he hand him the gun and he handed him the gun, he only thought that Thomas Mitchell's intent was to scare Jacob Bernard Smith with the gun. This would also be under the theory of aiding and abetting. Using a gun to scare someone, if this is done without legal justification, is an unlawful act. And if this unlawful act proximately caused Jacob Bernard Smith's death, then this would be involuntary manslaughter.

So, in that connection, if you find that Thomas Mitchell did shoot Jacob Bernard Smith, and as a result of being shot, Jacob Bernard

Smith died, and that this defendant, Antonia Maurice Allen, hand-ed the pistol to Thomas Mitchell after Thomas Mitchell had requested that he hand him the pistol, but at the time that this request was made . . .—*that this defendant handed him the pis-tol he thought that Thomas Mitchell only wanted to scare Jacob Bernard Smith with the pistol,* then the most the defendant would be guilty of would be involuntary manslaughter.

(Emphasis added.)

In its final mandate the court explained the possible verdicts and directed that defendant would be guilty of aiding and abetting if, in addition to other elements, the jury found that when defendant handed Mitchell the gun "he knew or had reasonable grounds to know that his intention was to kill" the victim. It reiterated that defendant would be guilty of involuntary manslaughter, rather than first-degree murder, if defendant handed Mitchell the pistol, "and that at the time he believed Mitchell was going to scare—was only going to scare Jacob Bernard Smith, with a gun, and that it was not his intent to kill him."

The jury deliberated one hour and then returned to the court-room. The foreperson then asked the court to reinstruct the jury on the difference between first-degree murder and involuntary manslaughter. In response the court instructed again on defendant's possible guilt as principal, defendant as aider and abettor, and invol-untary manslaughter. The court stated that to find defendant guilty of aiding and abetting, the jury would have to find, in addition to other elements, that defendant "knowingly aided Thomas Mitchell in com-mitting this crime by handing him the pistol after Thomas Mitchell had requested him [to do so], and at that time that this defendant knew or had reason to know that Thomas Mitchell intended to kill Jacob Bernard Smith." As to involuntary manslaughter, the court again stated that under this theory, the jury would have to find that defendant "at the time he handed him the gun . . . believed that Mitchell was only going to scare Jacob Bernard Smith with the gun."

[2] Defendant argues that the aiding and abetting instructions con-stitute error because they did not require the jury to find that defend-ant premeditated, deliberated or shared a criminal purpose or intent with Mitchell to kill the victim. He contends that the standards "knew or should have known" and "reasonable grounds to believe" do not satisfy the element of specific intent required for the aiding and abet-ting theory of first-degree, premeditated and deliberated murder. According to defendant, these instructions completely relieved the

State of proving the intent element and were plain error that probably caused the jury to reach a different result than it would have without the error.

We agree with defendant that the court's use of the phrases "should have known" and "reasonable grounds to believe" was erroneous. To be convicted as an aider and abettor, "one must be actually or constructively present at the scene, share the criminal intent with the principal, and render assistance or encouragement to him in the commission of the crime." *State v. Rogers*, 316 N.C. 203, 229, 341 S.E.2d 713, 728 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988). The phrases used, in isolation, do not convey the concept of specific intent necessary for aiding and abetting a first-degree murder committed with premeditation and deliberation. *See State v. Blankenship*, 337 N.C. 543, 557-62, 447 S.E.2d 727, 734-38 (1994) (discussing specific intent required to satisfy the intent element of the similar doctrine of acting in concert for first-degree murder).

Given that the instructions were partially erroneous, we must determine whether they were plain error. " '[I]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court.' " *Odom*, 307 N.C. at 661, 300 S.E.2d at 378 (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154, 52 L. Ed. 2d 203, 212 (1977)). In reviewing an instruction for plain error, we must construe the charge contextually, *State v. Payne*, 337 N.C. 505, 523, 448 S.E.2d 93, 103 (1994), and "must examine the entire record and determine if the instructional error had a probable impact on the jury's finding of guilt," *Odom*, 307 N.C. at 661, 300 S.E.2d at 379.

Despite the court's erroneous use of the phrases "should have known" and "reasonable grounds to believe," we conclude that the instructions as a whole conveyed that under the theory of aiding and abetting, Mitchell had to have the specific intent to kill the victim; defendant had to know this was Mitchell's intent when he handed him the gun; and defendant, with that knowledge, intended to aid Mitchell in committing the crime. The court conveyed this principle by its overall instructions and specifically by its use of the phrase "knowingly aided." The probable interpretation of "knowingly aided" by the jury was that before it could find defendant guilty, it would have to determine that defendant knowingly participated in the crime based on an intent to assist Mitchell in committing it. *See State v. Woods*, 56

N.C. App. 193, 199, 287 S.E.2d 431, 435 (interpreting "knowingly aided" as clearly mandating a determination that defendant's participation "was advertent and pursuant to an intent to assist the actual perpetrator"), *cert. denied*, 305 N.C. 592, 292 S.E.2d 13 (1982). We also note that this phrase is used to describe the intent element in the North Carolina Pattern Jury Instructions on aiding and abetting. *See* N.C.P.I.—Crim. 202-20A (1989).

Further, after reviewing the entire record, we conclude that the erroneous portion of the instructions did not have a probable impact on the jury's guilty verdict. By his own admission, defendant was present at the scene of the crime and handed Mitchell his gun. Defendant further admitted that the gun had been repaired earlier on the day of the shooting. He therefore knew that the gun was in working order. The bullets obtained from the victim's body were fired from defendant's gun. Defendant gave an oral statement to Detective Parker indicating that in response to the food stamp discussion, defendant stated that he would shoot the victim. In the same statement, defendant indicated that Mitchell stated in his presence that he would shoot the victim, which tends to show that defendant knew what Mitchell's intent was when defendant handed him the gun. Evidence from several parties indicated that defendant stated that he had a "beef" with the victim, that the victim on a prior occasion had held a gun to defendant's head, and that defendant stated that he would "take care of" Hollingsworth's food stamp problem with the victim. Given this substantial evidence as to defendant's intent, we conclude that it is improbable that the erroneous portion of the court's instructions had an impact on the verdict.

The verdict itself also supports this conclusion. The jury found defendant guilty of first-degree murder and rejected the verdict of guilty of involuntary manslaughter. The verdict sheet does not indicate on which theory of guilt of first-degree murder the jury based its verdict. However, we can determine from the verdict of guilty of first-degree murder that the jury concluded either that defendant shot the victim, based on the testimony of both Mitchell and Chalmers that Mitchell was at Chalmers' all evening, or that defendant aided and abetted Mitchell in the first-degree murder by handing him the gun with the shared intent that Mitchell would kill the victim. By rejecting the verdict of involuntary manslaughter, the jury indicated that it did not believe defendant thought Mitchell only intended to scare the victim, and the instructions on involuntary manslaughter gave them the opportunity to interpret the evidence in this way. It therefore is

improbable that the erroneous portion of the instructions had an impact on the jury's verdict because the jury showed that it concluded defendant was more involved in the crime than defendant's testimony suggested.

For all of these reasons, we conclude that the instructions on aiding and abetting first-degree murder did not constitute plain error.

[3] In this assignment of error, defendant also maintains that the aiding and abetting instructions shifted the burden of proof to defendant because the court indicated that if the jury found that defendant thought Mitchell was only going to scare the victim, then the State had failed to prove that defendant knew or had reasonable grounds to believe that Mitchell was going to kill the victim. According to defendant, this statement suggested that defendant would have to prove that he thought Mitchell was only going to scare the victim.

He further contends that this alleged error was compounded by the court's instructions on involuntary manslaughter, to which defense counsel did not object. He argues that the involuntary manslaughter instructions impermissibly shifted the burden of proof on intent to defendant. The trial court instructed that involuntary manslaughter by aiding and abetting would be the appropriate verdict "under the version of what happened according to what the defendant himself testified to, that is, his testimony that when Thomas Mitchell requested that he hand him the gun and he handed him the gun, he only thought that Thomas Mitchell's intent was to scare . . . Smith with the gun."

Defendant is correct that he bears no burden of proof on the intent element, see State v. Strickland, 307 N.C. 274, 293, 298 S.E.2d 645, 658 (1983), holding modified on other grounds by State v. Johnson, 317 N.C. 193, 344 S.E.2d 775 (1986); however, neither the instructions on aiding and abetting nor the instructions on involuntary manslaughter shifted the burden to defendant. The probable interpretation of the complained-of portion of the aiding and abetting instructions was that if the State failed to prove that defendant aided and abetted Mitchell in the first-degree murder, then the jury was to consider the verdict of involuntary manslaughter. The use of the words "the State failed to prove" indicated to the jury that it was the State's burden of proof, not defendant's.

As to the involuntary manslaughter instruction, it directed the jury to consider defendant's testimony. Further, the trial court's

STATE v. ALLEN

[339 N.C. 545 (1995)]

instructions on aiding and abetting and on involuntary manslaughter expressly placed on the State the burden of proving defendant's guilt of the charges beyond a reasonable doubt. *See State v. Corbett,* 309 N.C. 382, 402-03, 307 S.E.2d 139, 151-52 (1983) (no shift of burden of proof to defendant when court instructed, "[i]f you find the facts to be as the defendant's evidence tends to show them, then you are to acquit the defendant," and charge as a whole conveyed the proper burden of proof). We conclude that there was no error, plain or otherwise, in these portions of the court's instructions.

Because we find no plain error in the court's instructions on aiding and abetting and on involuntary manslaughter, this assignment of error is overruled.

[4] Defendant next assigns as error the trial court's final mandate to the jury. The trial court's instruction directed the jury to find defendant guilty of first-degree murder if the State had proved beyond a reasonable doubt all of the elements of either the theory of defendant as the principal or the theory of defendant aiding and abetting Mitchell, who acted as the principal. Defendant did not object to the instruction but argues that it constituted plain error in that it deprived him of his right to a unanimous jury verdict under the North Carolina Constitution. N.C. Const. art I, § 24; *see* N.C.G.S. § 15A-1237(b) (1988). He reasons that the instruction allowed a jury verdict of guilty based on some jurors voting for guilt under one theory of first-degree murder and others voting for guilt under a different theory of first-degree murder. The verdict sheet does not reveal on which theory or theories the jury based its guilty verdict. He contends, therefore, that this instruction rendered the verdict fatally ambiguous. We disagree.

We have addressed the issue of disjunctive instructions in two lines of cases. *See State v. Lyons,* 330 N.C. 298, 302-08, 412 S.E.2d 308, 312-15 (1991) (discussing the principles established in the two lines of cases). In one line we held that a disjunctive instruction leads to a fatally ambiguous verdict when it "allows the jury to find a defendant guilty if he commits either of two underlying acts, *either of which is in itself a separate offense.*" *Id.* at 302, 412 S.E.2d at 312. In the second we held that a disjunctive instruction does not lead to a fatally ambiguous verdict if it allows the jury to find a defendant guilty based on either of two underlying acts, both of which separately support a theory of guilt for only one offense. *See, e.g., State v. Hartness,* 326 N.C. 561, 566-67, 391 S.E.2d 177, 180-81 (1990) (verdict not fatally ambiguous where statute supported conviction for taking indecent

liberties with a child upon proof of alternative acts, and instruction allowed jury verdict based on defendant's either improperly touching the child or inducing the child to touch him); *State v. Creason,* 313 N.C. 122, 129, 326 S.E.2d 24, 28-29 (1985) (verdict not fatally ambiguous where statute sought to prevent only one offense, that of possession of narcotics with intent to transfer, and instruction allowed jury verdict based on either possession with intent to sell or possession with intent to deliver); *Jones v. All American Life Ins. Co.,* 312 N.C. 725, 738, 325 S.E.2d 237, 244 (1985) (verdict not fatally ambiguous where plaintiff would be barred from recovering life insurance proceeds if she participated in killing of insured and disjunctive instruction allowed jury to find either that she killed or procured the killing of the insured).

The instruction here allowed the jury to consider two theories of guilt for first-degree murder, that is, that defendant alone shot the victim or that defendant aided and abetted Mitchell, who shot the victim. Because a finding of either of these two acts would result in a verdict of guilty of the offense of first-degree murder, the disjunctive instruction was not fatally ambiguous. It therefore was not error, much less plain error. This assignment of error is overruled.

Defendant's third assignment of error is a restatement of his argument involving the instruction on involuntary manslaughter. We have addressed this issue in defendant's first assignment of error.

We conclude that defendant had a fair trial, free from prejudicial error.

NO ERROR.