STATE OF NORTH CAROLINA v. RICHARD LEWIS JOHNSON

No. 124A85

(Filed 2 July 1986)

1. **Constitutional Law § 31— poisoning with insecticide—failure to appoint medical expert for defendant—no error**

    The trial court did not err by denying defendant's motion to appoint a medical expert to assist in the preparation of his defense to a prosecution for the murder of his daughter where defendant merely asserted that an expert was needed to analyze all available information and possibly to testify on his behalf but failed to set out a particularized need for a medical expert; defendant acknowledged that he received before trial a letter from the Director of Industrial Medicine for the corporation which manufactured the poison that killed his daughter and that the doctor reviewed the medical records in question, provided a great deal of expert information, and offered to answer any questions defense counsel might have; and trial counsel showed great skill and knowledge in cross-examining the State's medical and chemical experts. N.C.G.S. § 7A-450(b).

2. **Constitutional Law § 63— death-qualified jury—not unconstitutional**

    The practice of death qualifying the jury does not violate the federal constitution.

3. **Homicide § 4.1— murder by poison, lying in wait, imprisonment, starving, torture—intent to kill not an element**

    In a prosecution for murder by poisoning, the trial court was not required to instruct the jury on intent to kill because intent to kill is not an element of first degree murder where the homicide is carried out by poison, lying in wait, imprisonment, starving, or torture.

4. **Homicide § 30.1— murder by poison—automatically first degree—failure to submit second degree—no error**

    The trial court in a prosecution for first degree murder by poisoning did not err by failing to instruct the jury on second degree murder based on the possibility that the jury could have found that defendant administered the poison with the intent to injure the victim but without an intent to kill. Intent to kill is not necessary to constitute the crime of first degree murder when the murder was allegedly committed by means of poison; moreover, the only evidence to negate the elements of first degree murder was defendant's denial that he committed the offense.

5. **Homicide § 30.3— murder by insecticide—failure to submit involuntary manslaughter—no error**

    In a prosecution for first degree murder by poisoning, defendant was not entitled to have involuntary manslaughter submitted to the jury where the State's evidence was sufficient to fully satisfy his burden of proving each element of first degree murder and there was no other evidence to negate those elements other than defendant's denial that he committed the offense.

BEFORE *Lamm, J.*, at the 26 November 1984 Criminal Session of Superior Court, MADISON County, defendant was convicted of first-degree murder. Finding no evidence of any of the aggravating factors set out in N.C.G.S. § 15A-2000(e) which would support the imposition of the death penalty, the trial judge terminated the proceeding without a sentencing phase and imposed a sentence of life imprisonment. The defendant appeals as a matter of right pursuant to N.C.G.S. § 7A-27(a). Heard in the Supreme Court 17 April 1986.

*Lacy H. Thornburg, Attorney General, by David Roy Blackwell, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Gordon Widenhouse, Assistant Appellate Defender, for defendant-appellant.*

MEYER, Justice.

The State's evidence tended to show that the defendant and his wife, Brenda Johnson, separated in March 1984, and the defendant retained custody of the two children born of the marriage. The separation was less than amicable. At one point, the defendant and Mrs. Johnson engaged in a heated confrontation concerning Mrs. Johnson's access to the children. On that occasion, the defendant asked Mrs. Johnson if she "remembered Jim Ward and what he done to his family." Mrs. Johnson testified that, approximately ten years earlier, Ward had killed his children and then committed suicide. Mrs. Johnson stated that the defendant threatened to do the same thing.

In June 1984, the defendant lived in Hot Springs, North Carolina, with his eleven-year-old son, Christopher, and his five-year-old daughter, Joyce. In early June 1984, Christopher Johnson was brought to Asheville Memorial Mission Hospital. At the time of the admission, Christopher was sweating profusely, his pupils were pinpointed, his chest muscles were fluctuating violently, and his speech was slurred. He was diagnosed as suffering from organophosphate poisoning. An antidote was administered, and Christopher soon began to recover. He was released the following day.

On 15 June, Joyce Johnson was brought to Asheville Memorial Mission Hospital suffering from nausea, abdominal pain, headaches, and pain during urination. She was diagnosed as suffering from a urinary tract infection, and the doctor prescribed an antibiotic which was described as a sweet-odored, dark-orange liquid.

On the morning of 17 June 1984, the defendant told Christopher to look after Joyce while he went into town. The defendant then gave Joyce a teaspoon of white liquid. Christopher testified at trial that the liquid which the defendant administered to Joyce had an odor similar to bug poison. The defendant then proceeded to town. A few minutes after the defendant's departure, Joyce became very ill. White foam was coming from her mouth, her stomach was growling, she was staggering, and her conversation made no sense at all. Christopher stated that Joyce eventually laid down on the bed and stopped moving.

Meanwhile, the defendant went to the cafe in Hot Springs and ate breakfast. As he was leaving, he approached a local emergency medical technician (E.M.T.) who was also in the cafe. The defendant asked the E.M.T. where the town ambulance was located. The E.M.T. responded that the ambulance was in the garage next to the ambulance hut in order to be painted. The E.M.T. then inquired as to why the defendant was concerned about the whereabouts of the ambulance. The defendant simply responded, "I might need it later." The defendant then left the cafe.

Upon his return home, the defendant was made aware of Joyce's illness. He immediately took her to the ambulance hut in Hot Springs. The E.M.T.s placed Joyce in the ambulance and proceeded to Asheville. The defendant and Christopher followed in a pickup truck. Near the Madison County-Buncombe County line, Joyce was transferred to a Buncombe County ambulance which took her to Asheville Memorial Mission Hospital.

The ambulance arrived at the hospital shortly before 10:00 a.m. Dr. Thomas Howald testified that upon arrival Joyce was not breathing and had no pulse. She was foaming at the mouth, and her pupils were pinpointed. Dr. Howald stated that the bubblous secretions or foam had an odor which he associated with an organophosphate insecticide such as Malathion or Diazinon. He

detected the same odor in her vomitus. Dr. Howald further testified that an organophospate poison is the only type of poison that would cause the symptoms which he observed. He also opined that the poison was introduced into Joyce's system orally as opposed to being absorbed through the skin. Dr. Howald was also of the opinion that in order for Joyce to exhibit the symptoms that he observed, she would have had to orally ingest the poison within thirty minutes to two hours of the onset of the symptoms. He also stated that the symptoms he observed could not have been the result of a periodic, chronic exposure to organophosphate poisoning.

Despite a valiant effort by medical personnel to reverse the effects of the poison, Joyce suffered irreversible brain death. Life support systems were withdrawn on the afternoon of 20 June 1984, and Joyce died approximately thirty minutes later without ever regaining consciousness.

Tim Ramsey, a friend of the defendant, testified that he had a conversation with the defendant at the hospital on 20 June 1984. He testified that the defendant told him that the doctors had said Joyce "had got in some kind of poisoning." Ramsey stated that the defendant offered to take him to his house and show him what Joyce "had gotten into." He also testified that the defendant said half a teaspoon of the poison would kill a person. Ramsey further testified that approximately one month after the defendant and his wife separated, the defendant told him that he "would rather see the kids in hell as his wife have them."

On the afternoon of 20 June 1984, Dr. David Biggers, a pathologist at Asheville Memorial Mission Hospital, performed an autopsy on the body of Joyce Johnson. He testified that, in his opinion, Joyce's death was caused by extensive swelling of and softening of the brain. Dr. Biggers further testified that this opinion would be consistent with a finding of death resulting from organophosphate poisoning.

John Neal, a supervising chemist with the Occupational Health Pesticide Unit of the Public Health Laboratory of North Carolina, testified for the State. He analyzed a stomach fluid sample which was taken from Joyce Johnson upon her arrival at Asheville Memorial Mission Hospital. Mr. Neal testified that the sample contained 18.9 micrograms of Diazinon per gram of liquid.

Dr. Page Hudson, Chief Medical Examiner for the State of North Carolina, testified for the State. He testified that Diazinon is an organophosphate poison that may be introduced into the body through oral ingestion or absorption through the skin. He stated, however, that his experience and training indicated Diazinon poisoning could cause serious illness or death only when it had been orally ingested. Dr. Hudson was of the opinion that a teaspoon of Diazinon, administered orally, would be fatal to a child of Joyce's age and size. Dr. Hudson also testified that the various symptoms exhibited by Joyce and noted by Christopher Johnson, the E.M.T.s, and medical personnel at the hospital were consistent with organophosphate poisoning. He also agreed with Dr. Biggers' opinion that Joyce's death was caused by brain damage resulting from organophosphate poisoning.

The defendant testified on his own behalf. He stated that in early June 1984, he sprayed his house with Malathion in order to alleviate an insect problem. The insecticide which was left over was placed in a container and left on the back porch.

The defendant further testified that on the morning of 17 June 1984, he woke up his two children and prepared to go into town to get some gas. When Joyce acted as though she was not feeling well, the defendant was reminded that she was on medication. The defendant stated that he went to the refrigerator, got the bottle of medicine, and gave Joyce a teaspoonful. He then proceeded to town. He admitted asking the E.M.T. in the cafe about the whereabouts of the ambulance, but he indicated that he did so merely out of curiosity after observing that it was not parked in its usual location. The defendant denied telling Tim Ramsey that he had any poison at his house. He also denied making the statement attributed to him by his wife in which he threatened to kill his children and himself. The defendant testified that he loved Joyce and Christopher, and he denied administering poison to Joyce.

Leroy Johnson, the defendant's father, testified that he took Christopher to the hospital when he became sick in early June. Mr. Johnson told the doctor that Christopher had entered the house immediately after it had been sprayed for insects. The doctor asked if there was any of the insecticide remaining. Mr. Johnson said yes and brought the container to the hospital. He

testified that he never saw the container again. The defendant's mother testified that after Christopher was poisoned, the defendant scrubbed the entire house in an effort to remove all traces of the poison. Carol Johnson, the defendant's sister-in-law, testified that she was present during the confrontation during which the defendant was alleged to have threatened to kill his children. Carol Johnson testified that the defendant made no statement with regard to a "Ward man from Hot Springs." The defense also produced several witnesses who testified that the defendant had a good relationship with his children.

The jury found the defendant guilty of first-degree murder.

[1] The defendant initially argues that the trial court erred in denying his motion to appoint a medical expert to assist in the preparation of his defense. The defendant contends that such an expert would have aided in the investigation and preparation of his trial through the evaluation of medical reports, the autopsy results and samples, and the prevailing scientific data on organophosphate poisons. Defendant contends that the denial of the motion deprived him of his right to a fair trial. We conclude that the trial court did not err in denying this motion.

Under N.C.G.S. § 7A-450(b), the State must provide an indigent defendant "with counsel and the other necessary expenses of representation." We have interpreted this provision to require the appointment of expert assistance only upon a showing by the defendant that: (1) he will be deprived of a fair trial without the expert assistance, or (2) there is a reasonable likelihood that it will materially assist him in the preparation of his defense. *E.g.*, *State v. Watson*, 310 N.C. 384, 312 S.E. 2d 448 (1984); *State v. Oliver*, 309 N.C. 326, 307 S.E. 2d 304 (1983); *State v. Gray*, 292 N.C. 270, 233 S.E. 2d 905 (1977).

As noted by the defendant, the United States Supreme Court has recently addressed the question of appointment of experts to assist indigent defendants. In *Ake v. Oklahoma*, --- U.S. ---, 84 L.Ed. 2d 53 (1985), the Supreme Court was faced with the issue of whether an indigent defendant was constitutionally entitled to the services of an appointed psychiatrist. The Court stated that three factors were relevant to the resolution of the question: (1) the private interest that will be affected by the State, (2) the governmental interest that will be affected if the expert assist-

ance is to be provided, and (3) the probable value of the assistance that is sought and the risk of an erroneous deprivation of the affected interest if the assistance is not provided. *Id.* at ---, 84 L.Ed. 2d at 62. After applying these factors, the Court held that when a defendant makes an ex parte threshold showing to the trial court that his sanity is likely to be a significant factor in his defense, the federal constitution requires the State to provide a psychiatric expert to examine the defendant and to assist in the evaluation, preparation, and presentation of the defense. *Id.* at ---, 84 L.Ed. 2d at 66. The defendant argues that application of the factors enunciated in *Ake* leads to the conclusion that the trial court's refusal to appoint a medical expert in his case violated his right to due process. We do not agree.

The Supreme Court explicitly limited the holding in *Ake* to those cases where "a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial." *Id.* at ---, 84 L.Ed. 2d at 66. This requirement of a threshold showing of specific necessity was subsequently reaffirmed by the Court in *Caldwell v. Mississippi*, --- U.S. ---, 86 L.Ed. 2d 231 (1985), and is consistent with decisions of this Court holding that the denial of a motion for appointment of an expert is proper where the defendant has failed to show a particularized need for the requested expert. *E.g., State v. Artis*, 316 N.C. 507, 342 S.E. 2d 847 (1986). In his motion seeking the appointment of a medical expert, the defendant merely asserted that an expert was needed to analyze all available information and to possibly testify on his behalf. He failed to set out any facts evidencing a specific or particularized need for a medical expert. We are therefore unable to say that the trial court erred in denying the motion.

Furthermore, in his brief before this Court, the defendant candidly acknowledges that prior to trial, his mother received a letter from Dr. Edgar Flint, Director of Industrial Medicine for CIBA-GEIGY Corporation, a manufacturer of Diazinon. This letter discloses that Dr. Flint was provided with and reviewed the medical records in question. In the letter, Dr. Flint provided a great deal of expert information and offered to answer any further questions that defense counsel might have. It is therefore apparent that notwithstanding the trial court's denial of the motion, the defendant did in fact receive assistance from a medical expert and had the opportunity for continued access to such expert as-

sistance. Finally, we note that trial counsel showed great skill and knowledge in cross-examining the State's medical and chemical experts. (E.g., defense counsel cross-examined several of the State's medical witnesses concerning the possibility that Joyce may have suffered from a hereditary cholinesterase deficiency which may have rendered her more susceptible to organophosphate poisoning than would otherwise be the case.) For the reasons set out above, this assignment of error is overruled.

[2]   The defendant next argues that the practice of "death qualifying" the jury prior to the guilt phase of his trial violates the federal constitution on the grounds that it results in the selection of a jury biased in favor of the prosecution on the issue of guilt and which is not composed of a cross-section of the community. In the recent case of *Lockhart v. McCree*, --- U.S. ---, 90 L.Ed. 2d 137 (1986), the United States Supreme Court held that the federal constitution does not prohibit the removal for cause, prior to the guilt-innocence determination phase of a capital trial, of prospective jurors whose opposition to the death penalty is so strong that it would substantially impair the performance of their duties as jurors at the sentencing phase of the trial. This assignment of error is overruled.

[3]   The defendant's next argument relates to the instructions given to the jury by the trial court. The trial judge instructed the jury in pertinent part:

> Now, Members of the Jury, I charge that for you to find the Defendant guilty of first degree murder by means of poison, the State must prove three things beyond a reasonable doubt: FIRST, that the Defendant intentionally caused poison to be placed into or to enter the body of Joyce Johnson. A poison is a substance which is likely to cause death by a chemical reaction when placed into or caused to enter the body of a human being.

> Intent is a mental attitude which is seldom provable by direct evidence. It must ordinarily be proved by circumstances from which it may be inferred. You arrive at the intent of a person by such just and reasonable deductions from the circumstances proven as a reasonably prudent person would ordinarily draw therefrom.

SECOND, the State must prove that the Defendant did this with malice. Malice means not only hatred, ill-will or spite as it is ordinarily understood, to be sure that is malice, but it also means that condition of mind which prompts a person to take the life of another intentionally or to intentionally inflict serious injury upon another, which proximately results in her death without just cause, excuse or justification. Or to wantonly act in such a manner as to manifest depravity of mind, a heart devoid of sense of social duty and a callous disregard for human life.

And THIRD, the State must prove that the poisoning was a proximate cause of Joyce Johnson's death. A proximate cause is a real cause, a cause without which Joyce Johnson's death would not have occurred.

So, I finally charge you, Members of the Jury, that if you find from the evidence beyond a reasonable doubt that on or about June 17th, 1984, Richard Johnson intentionally administered Diazinon to Joyce Johnson by mouth, thereby proximately causing her death, and that he acted with malice, it would be your duty to return a verdict of guilty of first degree murder by means of poison.

The defendant contends that the trial court committed reversible error by failing to specifically instruct the jury that in order to return a conviction for first-degree murder, it was required to find that he possessed the specific intent to kill Joyce at the time the poison was administered. In order to resolve this issue, we find it necessary to review certain fundamental principles concerning first-degree murder.

N.C.G.S. § 14-17 provides:

§ 14-17. Murder in the first and second degree defined; punishment.

A murder which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate, and premeditated killing, or which shall be committed in the perpetration or attempted perpetration of any arson, rape or a sex offense, robbery, kidnapping, burglary, or other felony committed or attempted with the use of a deadly weapon shall be deemed to be mur-

der in the first degree, and any person who commits such murder shall be punished with death or imprisonment in the State's prison for life as the court shall determine pursuant to G.S. 15A-2000. All other kinds of murder, including that which shall be proximately caused by the unlawful distribution of opium or any synthetic or natural salt, compound, derivative, or preparation of opium when the ingestion of such substance causes the death of the user, shall be deemed murder in the second degree, and any person who commits such murder shall be punished as a Class C felon.

In *State v. Strickland*, 307 N.C. 274, 298 S.E. 2d 645 (1983), we interpreted this statute as separating first-degree murder into four distinct classes as determined by the proof: (1) murder perpetrated by means of poison, lying in wait, imprisonment, starving, or torture; (2) murder perpetrated by any other kind of willful, deliberate, and premeditated killing; (3) murder committed in the perpetration or attempted perpetration of certain enumerated felonies; and (4) murder committed in the perpetration or attempted perpetration of any other felony committed or attempted with the use of a deadly weapon.

First-degree murder has been historically defined in this State as the unlawful killing of a human being with malice and with premeditation and deliberation. *E.g., State v. Pridgen,* 313 N.C. 80, 326 S.E. 2d 618 (1985); *State v. Calloway,* 305 N.C. 747, 291 S.E. 2d 622 (1982); *State v. Lamm,* 232 N.C. 402, 61 S.E. 2d 188 (1950); *State v. Utley,* 223 N.C. 39, 25 S.E. 2d 195 (1943); *State v. Payne,* 213 N.C. 719, 197 S.E. 573 (1938). However, this definition is not entirely correct, as it is well established that the prosecution need not show premeditation and deliberation in order to obtain a conviction for first-degree murder under the felony-murder rule. *State v. Wall,* 304 N.C. 609, 286 S.E. 2d 68 (1982); *State v. Swift,* 290 N.C. 383, 226 S.E. 2d 652 (1976).

Numerous cases also hold that a specific intent to kill is an essential element of first-degree murder. *E.g., State v. Lowery,* 309 N.C. 763, 309 S.E. 2d 232 (1983); *State v. Jones,* 303 N.C. 500, 279 S.E. 2d 835 (1981); *State v. Mitchell,* 288 N.C. 360, 218 S.E. 2d 332 (1975), *death sentence vacated,* 428 U.S. 904, 49 L.Ed. 2d 1210 (1976); *State v. Wilson,* 280 N.C. 674, 187 S.E. 2d 22 (1972); *State v. Hamby,* 276 N.C. 674, 174 S.E. 2d 385 (1970), *death sentence*

*vacated*, 408 U.S. 937, 33 L.Ed. 2d 754 (1972). Once again, this is not completely correct, as it is well established that a homicide committed during the perpetration or attempted perpetration of a felony is first-degree murder without regard to whether the death was "intended." *E.g., State v. Swift*, 290 N.C. 383, 226 S.E. 2d 652; *State v. Shrader*, 290 N.C. 253, 225 S.E. 2d 522 (1976); *State v. Thompson*, 280 N.C. 202, 185 S.E. 2d 666 (1972); *State v. Maynard*, 247 N.C. 462, 101 S.E. 2d 340 (1958).

In *State v. Strickland*, 307 N.C. 274, 298 S.E. 2d 645, we stated that when a homicide is perpetrated by means of poison, lying in wait, imprisonment, starving, or torture, the law conclusively presumes that the murder was committed with premeditation and deliberation. In a concurring opinion, Justice Mitchell took issue with this statement. He felt that "when a homicide is perpetrated by means of poison, lying in wait, imprisonment, starving or torture, the law does not presume, conclusively or otherwise, that the murder was carried out with premeditation and deliberation. Instead, the presence or absence of premeditation and deliberation is irrelevant." *Id.* at 306, 298 S.E. 2d at 663. We belatedly conclude that Justice Mitchell's well-reasoned view was correct and now hold that premeditation and deliberation is not an element of the crime of first-degree murder perpetrated by means of poison, lying in wait, imprisonment, starving, or torture. Likewise, a specific intent to kill is equally irrelevant when the homicide is perpetrated by means of poison, lying in wait, imprisonment, starving, or torture; and we hold that an intent to kill is not an element of first-degree murder where the homicide is carried out by one of these methods. Cases from other jurisdictions support this view. *See People v. Thomas*, 41 Cal. 2d 470, 261 P. 2d 1 (1953); *State v. Thomas*, 135 Iowa 717, 109 N.W. 900 (1906); *State v. Wagner*, 78 Mo. 644, 47 Am. Rep. 131 (1883); *Rupe v. State*, 42 Tex. Cr. R. 477, 61 S.W. 929 (1901). *But see State v. Farmer*, 156 Ohio St. 214, 102 N.E. 2d 11 (1951). Since the intent to kill is not an element of the crime of first-degree murder when the murder is perpetrated by means of poison, the trial court was not required to instruct the jury on intent to kill.

We acknowledge that there is language in several prior opinions of this Court which intimates that in cases involving death by means of poison, the prosecution is still required to come forward with evidence showing an intent to kill in order to obtain a

conviction for first-degree murder. *See, e.g., State v. Barfield,* 298 N.C. 306, 259 S.E. 2d 510 (1979). In *Barfield,* the defendant was charged with first-degree murder by poison. We held that evidence that the defendant had poisoned other individuals was admissible on the basis that "[s]uch evidence is clearly relevant in a prosecution for first-degree murder in that the state must prove a specific intent to kill if it is to win a conviction." *Id.* at 328, 259 S.E. 2d at 529. We also note that the pattern jury instruction for first-degree murder by means of poison includes a specific instruction requiring the jury to find that the defendant administered the poison with the intent to kill the victim. N.C.P.I.—Crim. 206.12 at 3 (1978). Nevertheless, we hold that when the State proceeds upon a theory of first-degree murder perpetrated by means of poison, the State is not required to come forward with evidence tending to show that the defendant possessed the intent to kill the victim, and the trial judge should not instruct the jury that it is required to find such an intent as a prerequisite for returning a conviction for first-degree murder.

When a murder is committed during the commission of a felony, the murder is first degree even if all of the evidence presented tends to show only an intent to injure. The rule is no different when the murder is committed by means of poison—the murder is first degree even if all the evidence presented tends to show only an intent to make the victim ill. In the case before us, the only contention of the defendant is that he did not administer the poisonous substance at all.

[4] The defendant also contends that the trial court erred by failing to instruct the jury on second-degree murder based on the possibility that the jury could have found that he administered the poison with the intent to injure the victim but without an intent to kill. However, as discussed above, an intent to kill is not necessary to constitute the crime of first-degree murder when the murder was allegedly committed by means of poison. Any murder committed by means of poison is automatically first-degree murder. Furthermore, a defendant is entitled to have a lesser-included offense submitted to the jury only when there is evidence to support it. *Id.; State v. Shaw,* 305 N.C. 327, 289 S.E. 2d 325 (1982); *State v. Duboise,* 279 N.C. 73, 181 S.E. 2d 393 (1971). The defendant emphatically and repeatedly testified that on the morning of 17 June, he gave Joyce a teaspoon of medicine and that at

no time did he administer Diazinon to his daughter. If the State's evidence is sufficient to fully satisfy its burden of proving each element of the greater offense and there is no evidence to negate these elements other than the defendant's denial that he committed the offense, the defendant is not entitled to an instruction on a lesser offense. *See State v. Strickland*, 307 N.C. 274, 298 S.E. 2d 645. The evidence in this case supported each element of the charged crime of first-degree murder. The only evidence to negate these elements was the defendant's denial that he had committed the offense. The trial court did not err by refusing to instruct the jury on second-degree murder.

[5] Finally, the defendant argues that the trial court erred by failing to instruct the jury on the lesser-included offense of involuntary manslaughter. We do not agree.

Involuntary manslaughter is a lesser-included offense of murder. *State v. Greene*, 314 N.C. 649, 336 S.E. 2d 87 (1985); *State v. Mercado*, 314 N.C. 659, 336 S.E. 2d 87 (1985). As noted above, a defendant is entitled to have a lesser-included offense submitted to the jury only when there is evidence to support it. *State v. Strickland*, 307 N.C. 274, 298 S.E. 2d 645. Involuntary manslaughter has been defined as the unlawful and unintentional killing of another without malice which proximately results from an unlawful act not amounting to a felony nor naturally dangerous to human life, or by an act or omission constituting culpable negligence. *E.g., State v. Watson*, 310 N.C. 384, 312 S.E. 2d 448; *State v. Bondurant*, 309 N.C. 674, 309 S.E. 2d 170 (1983). The defendant notes that a great deal of evidence was elicited as to the differences in the odor and appearance of organophosphate poison and the medicine which had been prescribed for Joyce. He argues that based on this evidence, the jury could find that he was culpably negligent in administering the insecticide instead of the medicine. This contention, however, ignores the fact, alluded to above, that the defendant testified that he gave the victim medicine and did not at any time either by design or by mistake administer insecticide to his daughter. Since the State's evidence was sufficient to fully satisfy its burden of proving each element of first-degree murder and there was no other evidence to negate these elements other than the defendant's denial that he committed the offense, the defendant was not entitled to an instruction on the lesser-included offense of involuntary manslaughter. *See*

*State v. Strickland,* 307 N.C. 274, 298 S.E. 2d 645. This assignment of error is overruled.

The defendant received a fair trial, free from prejudicial error.

No error.