STATE OF NORTH CAROLINA v. DENNIE LEE CHERRY, III, DEFENDANT

No. COA99-1536

(Filed 29 December 2000)

## 1. Evidence— opinion testimony—victim died from gunshot wounds to back of head

The trial court did not err in a first-degree murder case by allowing a deputy sheriff to testify that in his opinion the victim died from the gunshot wounds to the back of his head, because: (1) the deputy described the position of the victim's body and testified that he had seen bullet wounds to human bodies numerous times; (2) the deputy illustrated the nature and extent of the wounds with a photograph of the victim's body; and (3) the victim's wounds were lethal in nature to a sufficient degree to render expert medical testimony as to the cause of death unnecessary.

**2. Jury— excusal for cause—opposition to death penalty— jury recommended life—no prejudicial error**

Although defendant contends the trial court improperly excused jurors for cause in a first-degree murder case after they expressed their opposition to the death penalty, defendant cannot show that he was prejudiced when the jury recommended life imprisonment rather than the death penalty.

**3. Criminal Law— prosecutorial misconduct—reading defense counsel's billing records that were in open court file—not attorney-client privilege**

The trial court did not err in a first-degree murder case by denying defendant's motion for a mistrial based on the district attorney's alleged prosecutorial misconduct of reading some of defense counsel's billing records that had been inadvertently placed in the open court files, because: (1) billing records do not automatically fall under the attorney-client privilege; (2) the billing records in this case disclose only general professional activities such as travel, interviews, phone calls, and memo writing; and (3) the records do not contain any confidential communications such as specific research or litigation strategy undertaken by defense counsel.

**4. Jury— *Batson* challenge—no prima facie showing**

The trial court did not err in a first-degree murder case by denying defendant's Batson motion and concluding that defendant failed to make a prima facie case of discrimination, because: (1) the trial court found no evidence of racial motivation; (2) the jury pool was predominantly African-American, and the State had six peremptory challenges left; and (3) the trial court accepted the prosecutor's race-neutral explanations that the excusal was based upon the potential black juror's record for prostitution and the fact that the potential juror did not understand the prosecutor's questions.

**5. Homicide— first-degree murder—instructions—second-degree murder as lesser-included offense not required**

The trial court did not err in a first-degree murder case by refusing to submit the lesser-included offense of second-degree murder to the jury because: (1) the lesser-included offense is not required to be submitted if the evidence is sufficient to satisfy the State's burden of proving each and every element of the offense of premeditated murder; and (2) there was ample

evidence to conclude defendant acted with premeditation and deliberation.

Appeal by defendant from judgment entered 6 March 1999 by Judge W. Russell Duke, Jr., in Bertie County Superior Court. Heard in the Court of Appeals 8 November 2000.

Evidence for the State tended to show that about 3:30 a.m. on the morning of 4 October 1997, defendant Dennie Cherry and Teon Stanford broke into a Bertie County residence which Ms. Sonja Williams shared with her boyfriend, Robert Earl Edwards, Jr. Both defendant and Stanford were armed. Ms. Williams was sleeping in her bedroom when she heard a bang at the front door and voices saying, "Police, M-F, don't move." Defendant and Stanford entered the bedroom, pointed their guns at Ms. Williams and Mr. Edwards, and ordered them to lie on the floor. While defendant watched Ms. Williams and Mr. Edwards, Stanford searched the house for valuables. When Stanford found nothing, defendant dragged Mr. Edwards to the living room and beat him until he revealed the location of some jewelry.

The State's evidence further tended to show that, after taking the jewelry, the men bound Mr. Edwards with a sheet. Defendant unsuccessfully attempted to tie Ms. Williams to Mr. Edwards, then made her lie down in a bedroom. Defendant told Stanford to shoot Mr. Edwards, whereupon Mr. Edwards began to plead for his life. Stanford fired a shot towards Mr. Edwards' legs, but refused to follow defendant's order to "shoot [Mr. Edwards] in the head." Defendant then crouched down next to Mr. Edwards and fired three shots into the back of Mr. Edward's head.

Ms. Williams further testified that defendant ordered Stanford to shoot her, and that Stanford fired towards Ms. Williams, hitting her leg. Defendant then instructed Stanford to shoot her in the head, but Stanford refused. Defendant then shot Ms. Williams three times in the head. Ms. Williams testified that she felt blood running and heard a loud ringing in her ears. Incredibly, she survived her wounds. After her attackers left, Ms. Williams phoned for emergency assistance. Responding to the call, Bertie County Deputy Sheriff Tim Terry arrived at Ms. Williams' residence and found the front door broken open and the lights on. Ms. Williams was lying on the floor next to the telephone. She had blood on her head, a gunshot wound in her thigh, and she said she had been beaten and shot. Deputy Terry also found

Mr. Edwards lying face down in the hallway with gunshot wounds to the back of his head. Mr. Edwards appeared to be dead.

Defendant was tried at the 15 February 1999 Criminal Session of Bertie County Superior Court for first-degree murder, first-degree burglary, robbery with a firearm, and assault with a deadly weapon with intent to kill, inflicting serious injury. The jury returned guilty verdicts on all of the charges, recommending a sentence of life imprisonment without parole on the murder conviction. The trial court sentenced defendant to life imprisonment without parole for the first-degree murder of Robert Earl Edwards, Jr., and to terms of imprisonment on the remaining charges. Defendant appealed from the judgments.

*Attorney General Michael F. Easley, by Special Deputy Attorney General Francis W. Crawley, for the State.*

*Donnie R. Taylor; and Charles A. Moore for defendant appellant.*

HORTON, Judge.

[1] Defendant first argues that the trial court erred when it allowed Deputy Sheriff Terry to testify that, in his opinion, Robert Edwards died from the gunshot wounds to the back of his head. At trial, the State offered no expert medical testimony as to Mr. Edwards' cause of death. Defendant contends that, because the only foundation for Deputy Terry's opinion was that he had seen bullet holes before, his opinion was in fact speculative and should have been excluded.

In homicide cases the cause of death may be established "without the use of expert medical testimony where the facts in evidence are such that every person of average intelligence would know from his own experience or knowledge that the wound was mortal in character." *State v. Minton*, 234 N.C. 716, 721, 68 S.E.2d 844, 848 (1952). Where the cause of death is obscure and beyond the experience and knowledge of the average layman, the prosecution must present expert medical testimony on the cause of death. *Id.* at 722, 68 S.E.2d at 848.

In *State v. Starnes*, 16 N.C. App. 357, 360, 192 S.E.2d 89, 91, *cert. denied*, 282 N.C. 429, 192 S.E.2d 841 (1972), a deputy sheriff who investigated a shooting testified that, in his opinion, the victim had died of a gunshot wound to the neck. Noting that the witness had described in detail the position in which he had found the deceased's

body, as well as the nature and extent of the wounds, this Court stated that "[i]t did not require a medical expert to conclude that the wounds described had caused the death. Any intelligent person who examined the body could have testified to that fact." *Id.*

In the instant case, Deputy Terry described the position of Mr. Edwards' body and testified that he had seen bullet wounds to human bodies "numerous times." He illustrated the nature and extent of the wounds with a photograph of Mr. Edwards' body, pointing out the bullet holes in Mr. Edwards' head. We find that Mr. Edwards' wounds were obviously lethal in nature to a sufficient degree to render expert medical testimony as to the cause of death unnecessary. The fact that Ms. Williams miraculously survived a similar assault by defendant does nothing to negate the clearly fatal character of Mr. Edwards' injuries. Thus, the trial court did not err in allowing Deputy Terry to testify as to the victim's cause of death, and we overrule defendant's first assignment of error.

**[2]** Defendant next argues that a number of jurors were improperly excused by the trial court for cause after they expressed their opposition to the death penalty. Defendant contends that their automatic exclusion, without rehabilitation offered to defendant, was prejudicial error. We disagree with defendant's contention. The jury did not recommend the death penalty, but rather life imprisonment, and therefore defendant cannot show that he was prejudiced by the excusing of the prospective jurors. *See State v. Goode*, 350 N.C. 247, 257, 512 S.E.2d 414, 420 (1999) (finding that even if it was error to excuse a prospective juror, the excusal "did not prejudice defendant since the jury recommended not the death sentence, but life imprisonment."). Defendant's second assignment of error is overruled.

**[3]** Next, defendant argues that the district attorney engaged in prosecutorial misconduct when he read some of defense counsel's billing records that had been inadvertently placed in the open court files. Defendant maintains that such billing records are absolutely protected under the attorney-client privilege and that their publication gave the district attorney an unacceptable advantage during trial. Defendant contends that the trial court's denial of his motion for a mistrial based on the district attorney's misconduct irreparably prejudiced him at trial.

The attorney-client privilege operates to protect confidential communications between attorneys and their clients. Billing records do not automatically fall under the attorney-client privilege, however,

regardless of their contents. *In re Grand Jury Proceedings*, 33 F.3d 342, 354 (4th Cir. 1994); *Chaudhry v. Gallerizzo*, 174 F.3d 394, 402 (4th Cir. 1999), *cert. denied*, 528 U.S. 891, 145 L. Ed. 2d 181 (1999). The attorney-client privilege *may* protect information in a billing record showing the " 'motive of the client in seeking representation, litigation strategy, or the specific nature of the service provided, such as researching particular areas of law.' " *Chaudhry*, 174 F.3d at 402 (quoting *Clarke v. American Commerce Nat. Bank*, 974 F.2d 127, 129 (9th Cir. 1992)).

In *Chaudhry*, the Fourth Circuit found that, although the attorney-client privilege normally protects only confidential communications, the billing records at issue in the case deserved protection because they identified the specific federal statutes researched by the attorney. Where the disputed materials contained only general information, however, the Fourth Circuit refused to extend attorney-client protection to an attorney's billing records, expense reports and travel records. *In re Grand Jury Proceedings*, 33 F.3d at 353-54.

After examining the billing record, we agree with the trial court that its publication did not irreparably harm defendant. The billing record in the instant case discloses only general professional activities such as travel, interviews, phone calls, and memo writing. Unlike *Chaudhry*, the records mention no specific research or litigation strategy undertaken by defense counsel. As such, we do not believe the billing records contain any confidential communications such as would deserve attorney-client protection. Therefore, we overrule this assignment of error.

**[4]** Defendant next asserts that he established a *prima facie* case of racial discrimination under *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986), and that the trial court erred in overruling such motion at trial. A defendant making a *Batson* motion establishes a *prima facie* case of discrimination by showing that he is a member of a cognizable racial group whose members the State has peremptorily excused from the venire under circumstances which raise an inference of racial motivation. *Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87. When determining whether the defendant has made the requisite showing, "the trial court should consider all relevant circumstances." *Id.* at 96, 90 L. Ed. 2d at 88.

Defendant made his motion when the prosecutor peremptorily challenged Juror Sutten, the twelfth out of fifteen African-Americans whom the prosecutor had stricken. Defendant argues that at that

point, he had established a *prima facie* case of racial discrimination, and the trial court erred in denying his motion. We disagree. Although defendant established the first two factors for a *Batson* claim, he did not demonstrate any circumstances which would impute improper motivation.

Because the trial court is in the best position to determine whether circumstances support an inference of purposeful discrimination, this Court will not disturb its determination absent clear error. *State v. Thomas*, 350 N.C. 315, 332, 514 S.E.2d 486, 497, *cert. denied*, 528 U.S. 1006, 145 L. Ed. 2d 388 (1999). The trial court in the instant case found no evidence of racial motivation to support a *prima facie* case for discrimination. When defendant made his *Batson* motion, the trial court noted that the jury pool was predominantly African-American, which meant that the State necessarily had passed over several African-Americans, since it had six peremptory challenges left. Moreover, the prosecutor stated, and the trial court accepted as a race-neutral explanation, that Juror Sutten's excusal was based upon her purported record for prostitution. Further, the prosecutor stated that Juror Sutten did not understand his questions to her. This Court has "confidence that trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors." *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88. We find no evidence of record that the trial court abused its discretion in rejecting defendant's *Batson* motion. Defendant's assignment of error is therefore overruled.

**[5]** Finally, defendant argues that the trial court erred in refusing to submit the lesser included offense of second-degree murder to the jury. If the evidence at trial is sufficient to fully satisfy the State's burden of proving each and every element of the offense of premeditated murder in the first degree, and there is no evidence to negate this, either from the State or the defendant, then the denial is proper. *State v. Strickland*, 307 N.C. 274, 293, 298 S.E.2d 645, 658 (1983), *overruled on other grounds, State v. Johnson*, 317 N.C. 193, 344 S.E.2d 775 (1986). Defendant argues that he never told anyone that he was going to murder Earl Edwards, but rather only that he was going to rob him, and that his statement negates the element of premeditation and deliberation such as to necessitate an instruction on second-degree murder.

Defendant's argument is without merit. Defendant's earlier statement that he intended to rob Mr. Edwards does nothing to negate his

later actions from which premeditation and deliberation are inferred. Defendant carried a loaded gun to his victims' home. Once there, despite complete submission and lack of provocation by Mr. Edwards and Ms. Williams, defendant twice instructed his accomplice, Teon Stanford, to shoot Mr. Edwards and Ms. Williams in the head. When Stanford refused, defendant deliberately shot his victims three times each to the back of the head in an execution-style fashion. We find these facts to be ample evidence that defendant acted with premeditation and deliberation. The trial court was correct in refusing to give an instruction on second-degree murder, and therefore defendant's final assignment of error is overruled.

We find that defendant received a fair trial, free from prejudicial error. In the judgment of the trial court we find

No error.

Judges LEWIS and McGEE concur.