STATE OF NORTH CAROLINA v. KEITH SAMUEL EVANS, Defendant

No. COA01-296

(Filed 16 April 2002)

**1. Appeal and Error— preservation of issues—objection not ruled upon**

An assignment of error to testimony that defendant had emerged from an apartment holding two children as a shield was not preserved for review in a first-degree murder prosecution where the trial court did not rule on defendant's motion to strike and defendant never asked the court to instruct the jury to disregard the testimony. Moreover, the subsequent testimony that defendant was holding the children up and in front and that they weren't wearing jackets at 3:00 a.m. constituted a description of events the witness had observed.

**2. Evidence— hearsay—not prejudicial**

There was no prejudicial error in a first-degree murder prosecution from the admission of an officer's testimony that a witness had been reluctant to talk with police because she was afraid. The testimony was hearsay because the witness did not testify regarding her reluctance to speak with the police, but not prejudicial because her statement was that she was afraid of talking to the police, not that she was afraid of defendant.

**3. Homicide— first-degree murder—instruction on involuntary manslaughter refused**

The trial court did not err in a first-degree murder prosecution by refusing to give an instruction on involuntary manslaughter where defendant did not dispute that the State presented evidence of each element of first-degree murder and defendant's statement, even if believed, indicates that the shooting was deliberate rather than accidental or the result of negligence.

**4. Criminal Law— flight—evidence sufficient**

The trial court did not err in a first-degree murder prosecution by instructing the jury on flight where defendant claimed that the evidence showed only that he went to his sister's apartment after the shooting, but there was sufficient evidence that defendant was attempting to escape apprehension in that defendant came out of the apartment carrying his nephews as a shield after police tracked him down.

Appeal by defendant from judgment entered 3 March 2000 by Judge William H. Freeman in Guilford County Superior Court. Heard in the Court of Appeals 23 January 2002.

*Attorney General Roy Cooper, by Special Deputy Attorney General James P. Longest, Jr., for the State.*

*Frederick G. Lind, Assistant Public Defender, for defendant-appellant.*

HUDSON, Judge.

Defendant appeals his conviction and sentence for first degree murder. We find no prejudicial error.

At trial, the State presented evidence tending to show, *inter alia*, that Kathleen Lynn House ("Kathy" or "House") was shot in the chest at close range and that another bullet grazed her head. She died at the scene of the shooting from the chest wound.

Lakeisha Diane Sides testified that on the night of the shooting, she was babysitting the children of defendant's sister, Tashaunda. Stephen Hall ("Steve") and defendant were both at Tashaunda's apartment with Sides. Sides testified that the children went to bed at about 10:00 p.m., and she lay down in the other room. Sometime after midnight, Sides woke up and found Steve and defendant with a white girl named Kathy. They were eating in the kitchen. When she got up again about fifteen or twenty minutes later, the three were gone.

Mark Rorie, also known as "Fellow," lived near Tashaunda and was also defendant's mother's boyfriend. Rorie testified that at about 11:30 p.m. on the night of the shooting, he was outside Tashaunda's apartment and saw Steve with a white girl talking about money. Later, defendant asked Rorie to go to the store and change a $20 bill. Rorie came back to the apartment with the change. Defendant was sitting at the kitchen table, and Stephen was in the bathroom with the white girl. Defendant told Rorie to keep $15 and give the remainder of the change to Steve. When Rorie gave Steve the money, he saw that the white girl was giving Steve oral sex. Rorie left and went to a nearby apartment. He later heard gunshots. He returned to Tashaunda's apartment to find Steve on the porch wiping off a .380 handgun and acting nervous. Defendant came running up to the apartment. He was wearing a brown coat with a white fur collar. Defendant was yelling to Steve, "Come here, Man. Why you do that, Man? Come here." Rorie testified that Steve put the gun down on the porch and left, and that

Rorie, followed by defendant, went into the apartment at about the time the police arrived. In the statement Rorie made to police soon after the incident, Rorie stated that he went into the apartment shortly before defendant came running up.

Michael Bennett, a witness who lived in the vicinity where House was killed, testified that he looked out his window and saw a man chasing a white woman, who was screaming. The witness saw a man grab the woman from behind and shoot her in the chest. After the woman fell, the man fired another shot towards her head. Bennett described the shooter as a black male, wearing a brown coat with a white collar.

Pamela Baldwin, who also lived in the vicinity of the shooting, testified that she woke up after midnight hearing a woman screaming. She looked out the window and saw a man run across the street and hide behind a tree. Another man, wearing a brown coat, was running behind him. The second man yelled, "Steve, Steve, did you do it? Did you get it?" Steve held up a dark object. Steve then ran after the woman, followed by the man in the brown coat, and they all disappeared from Baldwin's view. Baldwin heard two gunshots and then saw Steve running away. The man in the brown coat then ran off in the same direction, yelling, "Steve, Steve, where are you."

Witnesses interviewed by police at the scene of the shooting reported that they heard a man and woman arguing, heard a woman screaming and then gunshots, and then saw a black man wearing a brown coat with a white collar running away. Police broadcast a description of the shooter over the radio.

As he was driving to the scene of the shooting, Officer N.S. Edwards observed a man fitting the description, later identified as defendant, running with his hands inside his coat. Officer Edwards saw defendant enter an apartment, which was later identified as Tashaunda's apartment. Officer Edwards requested assistance and watched the apartment until other police units arrived. Officer Edwards shined his flashlight into an open side window of the apartment. Officer Edwards testified that "there were a lot of police cars out in the front." While the other officers covered the front and side of the apartment, Officer Edwards attempted to contact the communications center so they could make a call into the apartment. While Officer Edwards was doing this, defendant came out of the building holding two children. Police officers told defendant to put the children down. Defendant looked at the officers around him, held the

children for a few seconds, and then put them down. Police took defendant into custody.

A .380 semi-automatic handgun was found on the ground near where defendant was apprehended. Police officers later returned with a search warrant to search the apartment. They found a nine millimeter pistol in a clothes basket and the brown coat defendant had been wearing when spotted by Officer Edwards. The bullet extracted from House's body matched the nine millimeter gun taken from Tashaunda's apartment. Two nine millimeter shell casings were recovered from the ground near House's body. Several .380 millimeter shell casings were found between the shooting site and Tashaunda's apartment.

After he was taken into custody, defendant gave a statement to police, which he amended. Both versions were read to the jury. The amended statement reads as follows:

Earlier this morning I was at my sister's house. I had been there all day. Steve Hall and Fellow [Rorie] came in with a girl. I was in bed. Steve and Fellow got the girl there to [give them] oral sex. The girl was about my height. I think she was white or mixed or something. She had on a black shirt. Fellow and Stephen asked me for $20, and I gave Fellow $20. Steve went into the bathroom. He came out in a few minutes. Steve was pissed because she didn't finish [giving him oral sex]. Fellow went in with the lady and they came out. Fellow and Steve and me were in the front room. I think the lady on the front porch. Steve was talking about robbing her. I told him she didn't have but the $20. We had given her something to eat and drink. Steve wanted to get the money back because she didn't finish it. Steve, Fellow, and the lady walked over toward Hampton. They were by the basketball court and I heard a shot, and I heard her scream. I ran over there and I got up with Steve and Fellow by the apartment near the court. I had put on my coat, my fur coat. It's brown. She was somewhere near the building. She was several yards ahead of us. Steve took off first. I think Fellow left. I caught up with Steve. The lady was hollering. Steve said he was going to shoot her. Steve took off running, and I was jogging behind. Steve told me to go behind the other side of the building. Steve told me to go get her. I ran around the building. I caught up with her and I grabbed her sweater. She turned around swinging her arms. Steve got there and the shot went off. I was dazed. She ran again. She ran into the

street. She was hollering. I took the gun from Steve. It was a black and gray Ruger P95-DC. It wasn't supposed to happen. I got scared. I shot her again because I was scared because of the alcohol. I don't know how to control alcohol. I'm sorry this happened. It shouldn't have happened to the lady. She was doing what she did to make her living. She was just trying to make a hustle. I had over two six-packs of beer earlier before this happened.

I.

**[1]** Defendant first argues that the trial court erred in failing to instruct the jury to disregard part of Officer Edwards's testimony in which he described the manner in which defendant was holding the children. Officer Edwards testified for the State that while he was outside Tashaunda's apartment, he heard other officers shout "Put the child down. Put the child down." Officer Edwards's testimony continued as follows:

Q. And how did you react?

A. I looked around the side of the building to see exactly what's going on. That's when I see the first individual exit the apartment holding the two children.

Q. Can you describe how he's holding these children?

A. Uh, there was no question in my mind that the children were being held up in front of him as a shield.

MR. RUMSEY [Defense Counsel]: Well, objection, Your Honor.

MR. LEE [Defense Counsel]: Objection.

MR. RUMSEY: Move to strike.

MR. COLE [District Attorney]: Question was asked, Your Honor.

THE COURT: Well, I'll sustain that objection.

Q. Can you describe the manner in which the children were being held?

A. They were held in front and up.

Q. All right.

A. It's 3:00 in the morning. The children don't have any jackets on—

MR. RUMSEY: Objection, Your Honor. This is not relevant. He's—

MR. COLE: He's describing his observations, Your Honor.

THE COURT: Overruled. Go ahead. Go ahead.

A. They don't have any jackets on. The children are—I do not have any children. I do not know how old they were, but they are big enough that if you were going to take them somewhere, you would lead them by the hand. Okay, there was no question in my mind what I was observing.

Defendant contends that the jury should have been instructed to disregard Officer Edwards's response that defendant was holding the children "as a shield."

The State argues that this assignment of error was not preserved for review because, although defense counsel moved to strike the testimony, the trial court did not rule on the motion, and defense counsel never asked the court to instruct the jury to disregard the testimony. We agree and hold that the absence of such an instruction was not error. Moreover, the testimony following defendant's first objection and motion to strike is unobjectionable, as it constitutes the witness's description of the events he observed. Therefore, the trial court did not err in overruling defendant's second objection. Accordingly, this assignment of error is overruled.

II.

[2] In his second assignment of error, defendant asserts that the trial court erred in admitting hearsay evidence over his objection. Corporal John Barrow of the Greensboro Police Department testified for the State that he had interviewed Pamela Baldwin, who lived in the area of the shooting. Corporal Barrow testified that Baldwin was initially reluctant to talk with police because she was afraid. The relevant exchange was the following:

Q. . . . Now, Corporal, in speaking with Ms. Baldwin, she initially indicated she was somewhat reluctant to talk; is that right? Or be identified in any way.

A. Yes, sir.

Q. And her reasons for that, if you know?

A. She had concerns with her well-being regarding—

**STATE v. EVANS**

[149 N.C. App. 767 (2002)]

[DEFENSE COUNSEL]: Objection, Your Honor.

THE COURT: You want to rephrase that?

Q. In speaking with Ms. Baldwin did she express any concerns about being identified?

[DEFENSE COUNSEL]: Well, objection to what she expressed. About her concerns as well, Your Honor.

THE COURT: Overruled. You can tell what she expressed.

A. She expressed concern that anyone knew that she was giving information on this case.

Defendant objected to the testimony and moved to strike on the ground that the testimony was hearsay and violated N.C. Rule of Evidence 404. *See* N.C. Gen. Stat. § 8C-1, Rules 404, 802 (1999). The court overruled the objection and denied defendant's motion to strike. We agree that the admission of the evidence was error, but we hold that the error was not prejudicial.

We disagree with defendant that the admission of the testimony in question violated Rule 404. Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." Rule 404(b) was not violated here, because Baldwin's statement did not relate to defendant's prior conduct. Thus, the cases cited by defendant are inapposite. *See State v. Shane*, 304 N.C. 643, 285 S.E.2d 813 (1982); *State v. Sanders*, 295 N.C. 361, 373-75, 245 S.E.2d 674, 682-83 (1978).

Similarly, admission of the testimony did not violate Rule 404(a), which provides in relevant part that "[e]vidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion." Defendant argues that the testimony was tantamount to a statement that Baldwin was afraid of defendant, which "impl[ies] that the defendant was a bad and dangerous person." We do not believe Baldwin's statement regarding her concerns for her well-being if she talked to the police is evidence of defendant's character. Even if the statement could be construed as evidence of defendant's character, we hold below that the admission of the testimony did not prejudice defendant.

Although admission of the testimony did not violate Rule 404, we hold that it was error, because the testimony in question was hearsay. *See* N.C. Gen. Stat. § 8C-1, Rules 801, 802 (1999). The State does not argue that this hearsay was admissible under an exception to the hearsay rules. We note that Baldwin had testified earlier, and, if Corporal Barrow's testimony were corroborative of Baldwin's earlier testimony, then Corporal Barrow's testimony would have been admissible for corroborative, nonhearsay purposes. *See, e.g., State v. Call,* 349 N.C. 382, 410, 508 S.E.2d 496, 513 (1998); *State v. Warren,* 289 N.C. 551, 557, 223 S.E.2d 317, 321 (1976). However, Baldwin did not testify regarding her concerns or her reluctance to speak with the police. Therefore, this evidence was inadmissible hearsay, and the trial court erred in overruling defendant's objection and in denying his motion to strike. *See Warren,* 289 N.C. at 557-58, 223 S.E.2d at 321.

Despite the error, defendant is not entitled to a new trial, because he has not shown that he was prejudiced. To establish prejudice, a defendant has the burden of showing that "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial." N.C. Gen. Stat. § 15A-1443(a) (1999). Defendant here has failed to carry his burden.

Corporal Barrow testified only that Baldwin was reluctant to be identified as a witness. The concerns Corporal Barrow attributed to Baldwin did not relate directly to defendant. Baldwin's statement was not that she was afraid of defendant, as defendant suggests, but rather, that she was afraid of talking to the police. Defendant does not explain how the admission of the statement prejudiced him, and, in light of the direct evidence supporting defendant's conviction, in particular, his own statement, we do not think there is a reasonable possibility that the jury would have reached a different result had this testimony been stricken.

Defendant cites *State v. Warren* in support of his contention that the error was prejudicial. *Warren* is distinguishable, however. In *Warren,* that part of the hearsay testimony that was not corroborative of the witness's earlier statement went directly to the defendant's guilt. Moreover, the hearsay testimony was contradictory in part to the witness's earlier statement. *See Warren,* 289 N.C. at 556-57, 223 S.E.2d at 320-21. Here, the content of the hearsay testimony is peripheral to defendant's guilt. We conclude that defendant was not prejudiced by the error.

## III.

**[3]** In his third assignment of error, defendant contends that the trial court erred in refusing to give a jury instruction on involuntary manslaughter. We disagree.

Involuntary manslaughter is "the unintentional killing of a human being without malice, proximately caused by (1) an unlawful act not amounting to a felony nor naturally dangerous to human life, or (2) a culpably negligent act or omission." *State v. Wingard*, 317 N.C. 590, 600, 346 S.E.2d 638, 645 (1986) (internal quotation marks omitted).

> In ruling on whether to charge the jury on a lesser included offense, the trial judge must make two determinations. The first is whether the lesser offense is, as a matter of law, an included offense of the crime for which defendant is indicted. . . . The second is whether there is evidence in the case which will support a conviction of the lesser included offense.

*State v. Thomas*, 325 N.C. 583, 590-91, 386 S.E.2d 555, 559 (1989); *see* N.C. Gen. Stat. § 15-170 (1999). Involuntary manslaughter is a lesser included offense of first degree murder. *See Thomas*, 325 N.C. at 591, 386 S.E.2d at 559. However, there is not evidence here to support an instruction on involuntary manslaughter.

The only evidence defendant proffers in support of the involuntary manslaughter instruction is the statement he made to police. Defense counsel quoted it in relevant part as follows:

> I caught up with her and grabbed her sweater. She turned around swinging her arms. Steve got there and the shot went off. I was dazed. She ran again. She ran in the street. She was hollering. I took the gun from Steve. It was a black and gray Ruger P95-DC. It wasn't supposed to happen. I got scared. I shot her again because I was scared because of the alcohol.

Defendant argues that this statement would allow a jury to find that he did not intend to kill the victim, but "acted in a negligent or even criminally negligent manner and recklessly discharged a firearm," thereby causing her death.

The test to be used in determining whether to instruct on a lesser included offense, however, "is not whether the jury could convict defendant of the lesser crime, but whether the State's evidence is positive as to each and every element of the crime charged and there is no conflicting evidence relating to any element of the crime charged."

*State v. Strickland*, 307 N.C. 274, 283, 298 S.E.2d 645, 652 (1983) (footnote omitted), *overruled in part on other grounds by State v. Johnson*, 317 N.C. 193, 344 S.E.2d 775 (1986). Our Supreme Court further elaborated as follows:

> [T]he mere fact that the evidence might support a verdict on the lesser crimes does not dictate that the trial judge instruct on the lesser grades. His decision rests on whether the evidence is sufficient to support the charge; that is, whether, in a murder case, the evidence raises a question with respect to premeditation and deliberation or malice, either under the facts or as raised by defendant's defenses.

*Id.* at 283 n.1, 298 S.E.2d at 652 n.1. Here, defendant does not dispute that the State presented evidence as to each element of first degree murder. Defendant's statement does not contradict the State's evidence. Even if the jury believed defendant's statement that he shot House because he "was scared because of the alcohol," the statement still indicates that the shooting was deliberate rather than accidental or as a result of negligence. Accordingly, we do not find that the statement creates a conflict in the evidence. The trial court did not err in refusing to give an instruction on involuntary manslaughter.

IV.

[4] In his fourth and final assignment of error, defendant argues that the trial court erred in overruling his objection to the instruction on flight. "[A] trial court may not instruct a jury on defendant's flight unless there is some evidence in the record reasonably supporting the theory that defendant fled after commission of the crime charged." *State v. Levan*, 326 N.C. 155, 164-65, 388 S.E.2d 429, 433-34 (1990) (internal quotation marks omitted). "Mere evidence that defendant left the scene of the crime is not enough to support an instruction on flight. There must also be some evidence that defendant took steps to avoid apprehension." *State v. Thompson*, 328 N.C. 477, 490, 402 S.E.2d 386, 392 (1991).

Defendant claims that the evidence showed that he went to his sister's apartment after the shooting and nothing more. He argues that his case is factually similar to *State v. Hutchinson*, 139 N.C. App. 132, 532 S.E.2d 569 (2000). We disagree. We summarized the relevant evidence in *Hutchinson* as follows:

> [T]he evidence showed that after defendant entered the house, he made no attempt to leave. Defendant remained on the back porch

after Jeffrey Watson confronted him. Even after Wendy Watson informed defendant that she had called the police, defendant walked away but did not attempt to hide or flee. In addition, when the police arrived, defendant did not attempt to avoid the police.

*Id.* at 139, 532 S.E.2d at 574. Here, in contrast, the State presented evidence that defendant went to his sister's apartment following the shooting, and, when police tracked him down there, he came out of the apartment carrying his nephews as a shield. This is sufficient evidence to support an inference that defendant was attempting to escape apprehension. *See State v. Beck*, 346 N.C. 750, 758, 487 S.E.2d 751, 757 (1997) (evidence that defendant took cab from crime scene to his residence but told cab driver to leave area after seeing police there was sufficient to support flight instruction). The trial court did not err in instructing the jury on flight.

No prejudicial error.

Judges WYNN and THOMAS concur.